[No. A119931. First Dist., Div. Three. Aug. 28, 2009.]

FIRST AMERICAN TITLE INSURANCE COMPANY, Plaintiff and Respondent, v.
XWAREHOUSE LENDING CORPORATION, Defendant and Appellant.

## COUNSEL

Gordon & Rees, Kevin W. Alexander, Kimberly D. Howatt and Benjamin T. Morton for Defendant and Appellant.

Leland Chan for California Bankers Association as Amicus Curiae on behalf of Defendant and Appellant.

Musick, Peeler & Garrett, Barry D. Hovis and Walter J.R. Traver for Gateway Bank, FSB as Amicus Curiae on behalf of Defendant and Appellant.

McDonough Holland & Allen, Michael T. Fogarty for Plaintiff and Respondent.

## OPINION

**McGUINESS, P. J.**—Plaintiff First American Title Insurance Company (First American) sought a declaration that it had no duty under its title insurance policies to defend or indemnify defendant XWarehouse Lending Corporation formerly known as Access Lending Corporation (Access).[1] The trial court issued the requested declaration after ruling that Access was not an insured entitled to coverage under the policies. We agree, and accordingly, affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

A.  *Background*

This litigation is part of the aftermath of a fraudulent loan scheme by CHL Mortgage Group, Inc. (CHL), now in chapter 7 bankruptcy, and CHL's president Laurence Seidenfeld, who pleaded guilty to certain fraud offenses and is currently in federal prison. Access is one of the victims of CHL's fraud.

Access is a company that facilitates or "warehouses" real property loans[2] for a short period between the time a mortgage broker originates a loan with

---

[1] During the course of the litigation, Access changed its name to XWarehouse Lending Corporation. In an order filed August 20, 2007, the trial court directed that the pleadings were to be amended to substitute "XWarehouse Lending Corporation formerly known as Access Lending Corporation," for each reference to "Access Lending Corporation." For clarity, we shall refer to the entity as Access in this opinion.

[2] "A real property loan generally involves two documents, a promissory note and a security instrument. The security instrument secures the promissory note. This instrument 'entitles the lender to reach some asset of the debtor if the note is not paid. In California, the security

a borrower and the time the mortgage broker sells the loan to an investor in the secondary mortgage market. CHL, a mortgage broker that issued residential mortgage loans to individual borrowers, was a client of Access between 2002 and 2004 pursuant to master repurchase agreements.

In the 2004 master repurchase agreement (MRA), CHL agreed to originate mortgage loans to individual borrowers and then sell the loans to Access. CHL would obtain a promissory note and a deed of trust from the borrower as collateral for the loan, and then sell the note and assign the deed of trust to Access. Within a certain period of time, CHL was required to repurchase the loan from Access for sale and delivery to a predesignated investor in the secondary mortgage market.

CHL was required to send certain mortgage documents to Access, including (1) the original mortgage note, endorsed in blank by CHL, (2) the original mortgage certified by the title company or closing agent to be a true copy of the original instrument sent for recording, (3) an original mortgagee title insurance commitment for each mortgage securing each loan, with CHL's "name, mortgagor's name, title policy amount and loan amount correctly delineated in Schedule A, paragraph one, no adverse liens, encroachments or overlapping of improvements and the inclusion of all valid Schedules A, B, C and D and insuring provisions"; and (4) an original mortgage assignment duly executed by CHL in blank.

The MRA also provided that at CHL's election, the purchase price for a loan could be funded by Access issuing its own check or wire transfer directly to the title company or closing agent's account on behalf of CHL, provided that CHL faxed to Access all specified documents and Access had verified to its satisfaction that CHL and the title company or closing agent were in possession of all mortgage documents relating to the loan, and had agreed to deliver all items to Access within three business days following the funding of the loan. If Access provided funds to close a loan and the loan did not close, CHL was required to arrange for the return of the funds to Access promptly.

---

instrument is most commonly a deed of trust (with the debtor and creditor known as trustor and beneficiary and a neutral third party known as trustee). The security instrument may also be a mortgage (with mortgagor and mortgagee, as participants). In either case, the creditor is said to have a lien on the property given as security, which is also referred to as collateral.' [Citation.]" (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1235 [44 Cal.Rptr.2d 352, 900 P.2d 601], fn. omitted.) For clarity, "[t]he terms 'deed of trust,' 'trustor,' and 'beneficiary' are used interchangeably in this opinion with 'mortgage,' 'mortgagor,' and 'mortgagee.' [Citation.]" (*Id.* at p. 1235, fn. 2.)

At issue here are two 2004 CHL loans Access allegedly purchased pursuant to the 2004 MRA. Specifically, CHL made one loan in the principal sum of $442,850 to a borrower named Martin Esparza and one loan in the principal sum of $550,000 to borrowers named Ajmer and Daljit Gill. Each promissory note in the principal sum of the loan from the named borrower to CHL was secured by a deed of trust on real properties allegedly held by the named borrowers as owners. After agreeing to purchase the loans, Access wired moneys directly to an escrow account created for the Esparza loan by the Alliance Title Company and another escrow account created for the Gill loan by the Ticor Title Company. At each loan closing, the escrow agents released the moneys "as a 'payoff'" to CHL, which was to use the moneys to refinance the named borrowers' existing loans. First American issued title insurance policies for the mortgage loans with CHL designated as the named insured. However, CHL never disbursed any funds directly to the named borrowers or otherwise used the funds to pay off any existing loans of the named borrowers.[3]

While the promissory notes and trust deeds were in Access's possession, the named borrowers failed to make any payments to Access, and CHL failed to repurchase the notes and trust deeds regarding the Esparza and Gill loans as required by the MRA. Access, as attorney-in-fact for CHL, recorded assignments of the Esparza and Gill deeds of trust.

Access sought to recover its funds by foreclosing the mortgage purportedly securing the Esparza loan after advising CHL's bankruptcy trustee of its intention to commence the foreclosure proceeding. The Esparza property was sold for $300,000. Access's right to any money from the foreclosure sale has been challenged in a pending lawsuit commenced by HSBC Mortgage Services in Contra Costa County Superior Court. Access tendered its claim for litigation defense costs in the HSBC case to First American, which has refused to defend Access in that case.

Access also commenced a proceeding to foreclose the mortgage purportedly securing the Gill loan. That proceeding was aborted after Access received the Gills' affidavit declaring they had not signed the promissory note or the deed of trust, and they threatened litigation if Access proceeded with the foreclosure. The Gills commenced an action to quiet title against Access

---

[3] The named borrowers submitted sworn declarations in this litigation that the promissory notes and trust deed documents allegedly memorializing the loans were forgeries. For purposes of this appeal, Access concedes that because of the borrowers' claims of fraud, the promissory notes and deeds of trust should be treated as forgeries.

on the ground that the 2004 loan documents were forgeries. Access tendered its claim for litigation defense costs in the Gill case to First American, which has refused to defend Access in that case.

### B.  *Litigation Under Review*

In the litigation before us, First American sought declaratory finding that it had no duty under the title insurance policies issued by it to CHL to defend or indemnify Access, on several grounds, including that Access did not meet the definition of an insured under the policies. Access answered First American's complaint, and filed a third amended cross-complaint, the operative pleading, seeking declaratory relief regarding its rights under the policies. Access alleged it was CHL's "assignee," and "successor-in-interest," and therefore, was an insured under the policies. Access also sought monetary damages for breach of contract and breach of the covenant of good faith and fair dealing based upon First American's refusal to reimburse Access for its losses and litigation defense costs.

First American and Access filed competing motions for summary judgment and adjudication to resolve the parties' rights and obligations under the policies. The trial court granted summary judgment in favor of First American, declaring that the title insurer had no duty to defend or indemnify Access. The court held that Access was not an insured and therefore, it was not entitled to coverage under the policies. The court dismissed Access's request for declaratory relief and its causes of action for breach of contract and breach of the covenant of good faith and fair dealing relating to the Esparza and Gill loans. Access then voluntarily dismissed with prejudice the remaining causes of action in its third amended cross-complaint. Access timely appeals from the judgment entered in favor of First American.

### DISCUSSION[4]

The interpretation of First American's title insurance policy "presents a question of law for this court to determine anew." (*Klingele v. Engelman*

---

[4] Access's position on appeal is supported by amicus curiae briefs filed by California Bankers Association and Gateway Bank, FSB (Gateway Bank). First American has filed separate responses to these briefs. Gateway Bank has a pending appeal in Division Two of this court from a judgment regarding title insurance claims arising from loan transactions involving CHL. (*Gateway Bank v. Ticor Title Co. of California* (A121398) (*Gateway*).) We denied the *Gateway* parties' request to transfer their appeal to a single division because this appeal and the *Gateway* appeal arise out of different judgments, between different parties, in different underlying actions.

(1987) 192 Cal.App.3d 1482, 1485 [238 Cal.Rptr. 199].) "Summary judgment is an appropriate vehicle to determine coverage under an insurance policy when it appears there is no material issue of fact to be tried and the sole issue before the court is one of law . . . ." (*Pepper Industries, Inc. v. Home Ins. Co.* (1977) 67 Cal.App.3d 1012, 1017 [134 Cal.Rptr. 904].)

"The Legislature has carved out three classes of insurance to cover land: title insurance, mortgage insurance, and mortgage guaranty insurance. Title insurance insures losses suffered 'by reason of . . . (a) Liens or encumbrances on[, or defects in the title to said] property; (b) Invalidity or unenforceability of [any] liens or encumbrances [thereon] or (c) Incorrectness of searches relating to the title . . . .' ([Ins. Code,] §§ 104 & 12340.1.) Mortgage insurance insures the payment of authorized real estate securities ([Ins. Code,] § 12500), and mortgage guaranty insurance insures against financial losses by reason of 'nonpayment of principal, interest, and other sums agreed to be paid under the terms of any note . . . secured by a mortgage, deed of trust, or other instrument constituting a first lien . . . on real estate.' ([Ins. Code,] § 12640.02, subd. (a).) Each class of insurance serves a different purpose, and together they protect California's real estate marketplace." (*Radian Guaranty, Inc. v. Garamendi* (2005) 127 Cal.App.4th 1280, 1285 [26 Cal.Rptr.3d 464].)[5]

■ In California, " '[t]itle insurance is a contract for indemnity under which the insurer is obligated to indemnify the insured against losses sustained in the event that a specific contingency, e.g., the discovery of a lien or encumbrance affecting title, occurs. [Citations.] [¶] Accordingly, when the contingency insured against under the policy occurs, the title insurer is not, by that fact alone, liable to the insured for damages in contract or tort, but rather is obligated to indemnify the insured under the terms of the policy. When the policy insures the lien of a deed of trust and the insured lien is junior to a lien undisclosed but insured against by the policy, the compensable loss is limited by the terms and conditions of the policy.' [Citations.]" (*Cale v. Transamerica Title Insurance* (1990) 225 Cal.App.3d 422, 425–426 [275 Cal.Rptr. 107].)

---

[5] In California, domestic title insurers, such as First American, may issue "title policies and may also insure: [¶] (a) The identity, due execution, and validity of any note or bond secured by mortgage. [¶] (b) The identity, due execution, validity and recording of any such mortgage. [¶] (c) The identity, due execution and validity of evidences of indebtedness issued by this State, or by any political subdivision or district therein, or by any private or public corporation." (Ins. Code, § 12390.) In this case, First American's title insurance policies do not insure the identity, due execution, or validity of the alleged notes that were purportedly secured by the mortgages.

At issue here is whether Access is an insured as defined under the title insurance policies issued by First American. Each policy provides that an insured is "the insured named in schedule A," which is CHL in each schedule A. The policy, in pertinent part, also defines an "insured" as "(i) the owner of the indebtedness secured by the insured mortgage and each successor in ownership of the indebtedness . . . ." The policy does not define the word "indebtedness."[6]

Access argues that the word "indebtedness" as used in the policy, is ambiguous because there is no definition of the word, and there is no explicit requirement that the indebtedness be valid. Given the ambiguity, Access contends the word "indebtedness" should be broadly construed so as to include its transfer of funds through escrows to CHL to pay off or refinance loans to the named borrowers. We conclude that Access's arguments are unavailing.

■ " 'While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. [Citations.]' 'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.' [Citation.] 'Such intent is to be inferred, if possible, solely from the written provisions of the contract.' [Citation.] 'If contractual language is clear and explicit, it governs.' [Citation.]" (*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 868 [77 Cal.Rptr.2d 107, 959 P.2d 265] (*Foster-Gardner*).)

■ " 'A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable.' [Citations.] The fact that a term is not defined in the policies does not make it ambiguous. [Citations.] Nor does '[d]isagreement concerning the meaning of a phrase,' or ' "the fact that a word or phrase isolated from its context is

---

[6] This appeal concerns the policy language in the 1992 standardized American Land Title Association (ALTA) Loan (Lender's) Policy for Title Insurance. (Cal. Title Insurance Practice (Cont.Ed.Bar 2d ed. 1997) app. I, p. 762 (rev. 6/08), quoting ALTA Loan (Lender's) Policy (1992).) In 2006, ALTA amended its standard form policy by revising the definition of an insured, and adding a definition of the word "indebtedness." In the 2006 ALTA form policy, an insured is now defined, in pertinent part, as "[t]he Insured named in Schedule A," and also includes "(A) the owner of the Indebtedness and each successor in ownership of the Indebtedness . . . ." The word "indebtedness" is now defined, in pertinent part, as "[t]he obligation secured by the Insured Mortgage . . . and if that obligation is the payment of a debt, the Indebtedness is the sum of [¶] (i) the amount of the principal disbursed as of Date of Policy; [¶] (ii) the amount of the principal disbursed subsequent to Date of Policy . . . ." (*Id.*, app. J, pp. 775–776, quoting ALTA Loan (Lender's) Policy (2006).)

susceptible of more than one meaning." ' [Citation.] ' "[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract." ' [Citation.]" (*Foster-Gardner, supra,* 18 Cal.4th at p. 868.) "No term of a policy is ambiguous if its meaning can be ascertained by fair inference from the remaining terms." (*O'Doan v. Insurance Co. of North America* (1966) 243 Cal.App.2d 71, 77 [52 Cal.Rptr. 184].) It is only " '[i]f an asserted ambiguity is not eliminated by the language and context of the policy, [that the courts will] then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage.' [Citation.]" (*Foster-Gardner, supra,* 18 Cal.4th at p. 868.) In the absence of any ambiguity, "the courts have no alternative but to give effect to the contract of insurance as executed by the parties. Accordingly, when the terms of the policy are plain and explicit the courts will not indulge in a forced construction so as to fasten a liability on the insurance company which it has not assumed. [Citations.]" (*Jarrett v. Allstate Ins. Co.* (1962) 209 Cal.App.2d 804, 810 [26 Cal.Rptr. 231].)

We reject Access's argument that the word "indebtedness" as used in the title insurance policy should be read as simply referring to the act of money changing hands, which would include Access's transfer of funds through the escrows to CHL. The word "indebtedness" cannot be read in isolation as referring to any indebtedness. It must be construed in light of the surrounding words, namely, "the owner of the indebtedness secured by the insured mortgage," or "the successor in ownership of the indebtedness," as well as the other parts of the policy. Each policy's schedule A describes the "insured mortgage" as a deed of trust from the named borrower (either Esparza or the Gills) to CHL executed and recorded on specific dates to secure an indebtedness from the named borrower to CHL in a specific amount. Thus, the indebtedness referred to in the definition of an insured can only be reasonably read as referring to the indebtedness between the named borrower (either Esparza or the Gills) and CHL, and not the transfer of funds by Access through the escrows to CHL.[7]

---

[7] Access argues that the deposition testimony of First American's representative Laurie Grushen supports its argument that the word "indebtedness" as used in the policy is ambiguous. We disagree. Grushen testified that the debt between Access and CHL "is not the indebtedness that's contemplated by the policy, which is the indebtedness between the borrower listed as the trustor in Schedule A and the beneficiary, which is also listed in Schedule A and appears as the named insured in Schedule A of the policy." When asked if that was clearly spelled out in the policy, Grushen replied, "It is not clearly set out because indebtedness is not a defined term, but you have to connect the dots. The dots are connected so that the indebtedness is the amount that the borrower owes the lender." The witness's testimony that a party "has to connect the dots" is a correct statement of the law. "In the construction of insurance policies, it is the settled rule that the whole of the contract is to be

■ Additionally, we conclude that in order for an entity to meet the definition of an insured under the title insurance policy issued by First American, there must be an existing indebtedness between the named borrower and the lender. We reject Access's argument that there is no need for there to be an existing indebtedness because the policy language does not contain any express qualification of the word "indebtedness." The word "indebtedness" does not require any qualifying language. Unless there is an existing indebtedness between the named borrower and lender the mortgage has no existence. (*Coon v. Shry* (1930) 209 Cal. 612, 615 [289 P. 815].) Thus, as it has been recognized, where an insured is defined as the owner of the indebtedness secured by the insured mortgage and each successor to ownership of the indebtedness, "there must have been a valid underlying indebtedness in existence in order for [the title insurer] to be liable under its policy." (*McClellan Realty v. Institutional Investors Trust* (M.D.Pa. 1988) 714 F.Supp. 733, 735–736, affd. without opn. (3d Cir. 1989) 879 F.2d 858.)[8]

To read the title insurance policy as suggested by Access—that the indebtedness secured by the insured mortgage is the moneys transferred from Access through the escrows to CHL—would result "in a forced construction in order to cast a liability upon the insurer which it has not assumed." (*National Auto. Ins. Co. v. Indus. Acc. Com.* (1938) 11 Cal.2d 689, 691 [81 P.2d 926].) "The question is not whether [First American] could have used other terms, but whether the terms used are clear and unambiguous. We hold that they are." (*Farm Air Flying Service v. Southeastern Aviation Ins. Services, Inc.* (1988) 206 Cal.App.3d 637, 640 [254 Cal.Rptr. 1].) Because

---

taken together, each clause helping to interpret the other." (*Jurd v. Pacific Indemnity Co.* (1962) 57 Cal.2d 699, 704 [21 Cal.Rptr. 793, 371 P.2d 569]; see Civ. Code, § 1641 ["The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."].)

[8] Access relies on cases in which the courts have upheld the right of a named insured or its assignee to recover from a title insurer for a loss due to a forged note or forged deed of trust or mortgage. However, in those cases, and unlike this case, moneys had been actually disbursed or credited to the named borrower by either the lender or its assignee. (See *Citicorp Savings of Illinois v. Stewart Title Guaranty Co.* (7th Cir. 1988) 840 F.2d 526, 530 [lender gave credit to borrower who had been previously adjudged incompetent]; *Lawyers Title Ins. v. First Federal Savings Bank* (E.D.Mich. 1990) 744 F.Supp. 778, 780 [lender issued checks to defrauding borrower]; *Mutual B.-L. Assn. v. Security T. I. & G. Co.* (1936) 14 Cal.App.2d 225, 226, 228 [57 P.2d 1392] [lender disbursed moneys to defrauding borrower]; *California Pac. T. & T. Co. v. MacArthur* (1934) 1 Cal.App.2d 323, 324, 326 [36 P.2d 413] [lender issued check to defrauding borrower]; *Keyingham Investments, LLC v. Fidelity National Title Ins. Co.* (2009) 298 Ga.App. 467 [680 S.E.2d 442, 444–445] [lender's assignees allowed to pursue title insurance claim of lender which disbursed funds to defrauding borrower]; *Greenpoint Mortgage v. Stewart Title Ins.* (N.Y.App.Div. 2008) 49 A.D.3d 687 [854 N.Y.S.2d 185, 187] [moneys of the lender's assignee were disbursed to named borrower who signed promissory note but forged wife's name on mortgage securing the note].)

there was no transfer of funds between CHL and the named borrowers Esparza and the Gills that created an indebtedness secured by the insured mortgage, Access does not meet the definition of an insured under First American's title insurance policies.

██ In the absence of any ambiguity in the policy, we do not apply "the rule that . . . the coverage of an insurance policy must be interpreted to include coverage the public may reasonably expect." (*Stearns v. Title Ins. & Trust Co.* (1971) 18 Cal.App.3d 162, 169–170 [95 Cal.Rptr. 682].) In any event, as we now discuss, the reasonable expectations of the parties would not support coverage for Access's losses and litigation defense costs relating to the Esparza and Gill loans.

First American's title insurance policies insure only against losses "sustained or incurred by the insured by reason of . . . [t]he invalidity or unenforceability of the lien of the insured mortgage upon the title." Access argues that it is the defects in the lien instruments which give rise to coverage in this case, and not the forged promissory notes. We disagree. Any losses suffered by Access are not due to defects in the title or mortgage liens, but are entirely due to the failure of an existing indebtedness between the named borrowers and CHL. (See *Blackhawk Production Credit v. Chicago Title* (1988) 144 Wis.2d 68 [423 N.W.2d 521, 526] ["If the interest held by [the insured mortgagee] was valueless without the superior lien, it cannot claim any lost value because the lien existed."].) This is so because even if title had been perfect and had been insured by the policies, Access would be in the same position as it currently stands. The liens would not be subject to foreclosure because no indebtedness existed between the named borrowers and CHL. Alternatively, if the named borrowers had received the benefit of the loans, then the deeds of trust would have been enforceable. (*Pacific American Construction v. Security Union Title* (1999) 1999 UT 87 [987 P.2d 45, 47].) Consequently, the losses suffered by Access are not the result of the invalidity or unenforceability of the lien of the insured mortgage upon the title.

██ In interpreting coverage under a title policy insuring only against the invalidity or unenforceability of the insured mortgage lien, the courts have held that such a title policy does not cover losses that are sustained due to the lack of an existing indebtedness between the named borrower and the lender. (See, e.g., *Pacific American Construction v. Security Union Title, supra,*

987 P.2d at p. 47 [lender's title insurance policy insuring against invalidity or unenforceability of insured mortgage lien does not cover loss due to lender's failure to disburse funds to owner of property securing the mortgage lien]; *Gerrold v. Penn Title Ins. Co.* (1994) 271 N.J. Super. 50 [637 A.2d 1293, 1295] [lender's title insurance policy insuring against invalidity or unenforceability of insured mortgage lien does not cover loss due to lender's failure to disburse funds to named borrower].)

The determination of no coverage is based on two premises we find persuasive. First, as explained by the court in *Bank of Miami Beach v. Fidelity & Casualty Co. of New York* (Fla. 1970) 239 So.2d 97, 99: "[A] mortgage lien and a mortgage debt are two entirely different legal concepts or 'species.' A provision [in a title insurance policy] guaranteeing that the mortgage constituted a 'valid mortgage lien' might be held to cover a loss resulting from fraud, mistake, duress, or misrepresentation in the procurement of the *mortgage* . . . but such a guarantee of the validity of the mortgage *lien* cannot and should not be construed as guaranteeing that the insur[e]r has made a careful investigation of the origin of the mortgage *debt* and guarantees its payment or validity. If such coverage is contemplated, the policy should specifically so provide." (See also *Lawyers Title Ins. Corp. v. JDC (America) Corp.* (11th Cir. 1995) 52 F.3d 1575, 1583 [a lender's title insurance policy insuring against the invalidity or unenforceability of the insured mortgage lien "insures against defects in the mortgage itself, but not against problems arising from or related to the underlying debt."].) Second, the reasonable expectations of the parties would not support a determination of coverage. As explained by the court in *Pacific American Construction v. Security Union Title, supra,* 987 P.2d 45: "It would be unreasonable to expect a title company to insure a debt about which it typically would have only limited knowledge and over which the lender would have sole control." (*Id.,* 987 P.2d at pp. 47–48, fn. omitted.) It is "[a] lender—not a title company—[that] is in the best position to insure that the debt underlying a mortgage is valid. . . . [A]bsent specific policy language to the contrary, the lender bears the risk that the mortgage debt is invalid." (*Id.* at p. 48; see *Bank of Miami Beach v. Fidelity & Casualty Co. of New York, supra,* 239 So.2d at p. 99.)

As applicable to Access's position as a purchaser of the purported loans originated by CHL, we conclude that it would not be reasonable for Access to expect that a title insurance policy issued to CHL would insure against a loss caused by CHL's failure to perform its obligations to disburse Access's funds either directly to the named borrowers or for the benefit of the named

borrowers. (*Gerrold v. Penn Title Ins. Co., supra*, 637 A.2d at p. 1296.) Access apparently recognized the risks inherent in its agreement with CHL, and took precautions to protect itself. In the 2004 MRA, CHL was required, among other things, to warrant that the mortgage notes and related mortgage liens were valid, and that "the full face amount" of the mortgage note was "funded" to the named mortgagor. "As security for" Access, CHL granted Access "a first priority security interest in all of [CHL's] right, title, and interest" in certain specified collateral owned by CHL. CHL also agreed to maintain "errors and omissions insurance or mortgage impairment insurance and fidelity bond coverage," showing Access as an additional loss payee on such policies, some of which are types of insurance not available from First American. (See *Radian Guaranty, Inc. v Garamendi, supra*, 127 Cal.App.4th at pp. 1285–1286 [title insurers are prohibited from transacting any other class of insurance other than the one for which they are authorized by their certificates of authority]; *Gerrold v. Penn Title Ins. Co., supra*, 637 A.2d at p. 1296.) That Access may not be able to recover its losses and litigation defense costs from CHL[9] does not permit the pursuit of a claim against First American for losses that are not covered by its policies.

■ California Bankers Association argues that our holding that Access is not entitled to title insurance coverage may have an adverse effect on the secondary mortgage market. However, whatever merit there may be to public policy considerations regarding the reasonable expectations of secondary mortgage market investors, such considerations have nothing to do with our determination that Access is not an insured and, therefore, not entitled to coverage under First American's title insurance policies. (See *Fireman's Fund Ins. Co. v. Superior Court* (1997) 65 Cal.App.4th 1205, 1214, fn. 8 [78 Cal.Rptr.2d 418].) "The answer is to be found solely in the language of the policies, not in public policy considerations." (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 818 [274 Cal.Rptr. 820, 799 P.2d 1253].)

■ We therefore conclude based upon our independent analysis of the issue that Access is not an insured under the title insurance policies. Consequently, First American has no duty to defend or indemnify Access for its losses and litigation defense costs relating to the Esparza and Gill loans.[10]

---

[9] In the *Gateway* action that is the subject of the appeal in Division Two of this court (see fn. 4, *ante*), Access filed a complaint in intervention against CHL for breach of contract, breach of guaranty, breach of the covenant of good faith and fair dealing, fraud, conspiracy to commit fraud, conversion, foreclosure on security interests, and negligence, based, in pertinent part, on allegations of CHL's failure to perform under the MRA.

[10] In light of our determination, we need not address the other contentions raised by the parties or amicus curiae.

## DISPOSITION

The judgment is affirmed. First American Title Insurance Company is awarded costs.

Pollak, J., and Siggins, J., concurred.