Filed 5/2/14  Flagstar Bank v. Lawyers Title Co. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| FLAGSTAR BANK, FSB, | B246701 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. BC437313) |
| LAWYERS TITLE COMPANY et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Barbara M. Scheper.  Affirmed.

Finlayson Williams Toffer, Roosevelt & Lilly, Jesse S. Finlayson for Plaintiff and Appellant.

Hennelly & Grossfeld, Michael G. King and Janice M. Kroll for Defendants and Respondents.

Plaintiff Flagstar Bank ("Flagstar") appeals the judgment entered following the trial court's grant of the motion for summary judgment of defendants Lawyers Title Company and Lawyers Title Insurance Company (together, "Lawyers Title"). Flagstar contends that the trial court erred in ruling there were no triable issues of material facts concerning its causes of action for breach of contract, fraud, and conspiracy to commit fraud. We see no error, and so affirm.

FACTUAL AND PROCEDURAL BACKGROUND

This case concerns three mortgage loan transactions consummated in the first half of 2008 which resulted in losses to Flagstar of nearly 2 million dollars. In the typical transaction between the parties involved, mortgage broker Automated Finance Company ("AFC") "originated" loans to borrowers to refinance their mortgages; the loans were to be used to pay off the existing mortgages on the homes, and were to be secured by first deeds of trust on the borrowers' homes in favor of AFC. AFC obtained the money to extend the loans using its line of credit with InSouth, a warehouse lender. InSouth would fund the loans, with the expectation that, shortly after closing, they would be sold by AFC to Flagstar, at which time InSouth would be repaid. AFC acted as escrow agent for the closing of the loans. However, rather than transmitting the funds to AFC, InSouth disbursed the money to Lawyers Title Company, which acted as AFC's sub-escrow agent, pursuant to written escrow instructions between the title company and AFC. These escrow instructions routinely provided that Lawyers Title was to pay off any prior liens prior to releasing funds to AFC or the borrower. Upon the closing of the loans, Lawyers Title would issue a lender's title policy to AFC, protecting the lender against defects in title.

In the three transactions at issue in this case, and contrary to the customary procedures described above, AFC instructed Lawyers Title to refrain from paying off the existing first mortgages and to instead forward the funds to AFC for further disbursement. AFC explained that it was in negotiations with the original mortgage

2

lenders to secure a waiver of prepayment penalties. Lawyers Title followed AFC's instructions and forwarded the loan funds to AFC. After making certain disbursements (including, for example, disbursing relatively small sums to the borrowers), AFC misappropriated the remaining funds. Lawyers Title issued title policies to AFC which excepted from coverage the liens of the existing first deeds of trust.

After the closing of the refinance loans, AFC sold the loans to Flagstar, falsely representing that the original secured loans had been paid off and that the AFC loans being sold to Flagstar were secured by first liens on the property, when in fact the liens were in second position. AFC apparently used the proceeds from Flagstar's purchase of the loans to repay InSouth's warehouse loans.

Although the borrowers initially made payments to Flagstar under the refinanced loans, they soon learned that their original mortgages had not been paid off, and ceased making payments to Flagstar. About this same time, the FBI investigated AFC's fraudulent loan activity, and AFC declared bankruptcy. In July 2008, Flagstar conducted an audit of the loans it had purchased from AFC and discovered massive fraud, including the fact that the existing liens on the three loans here at issue had not been paid off.

After Lawyers Title denied its title claim on the subject loans, Flagstar filed this lawsuit, alleging 8 causes of action against 16 defendants.[1] The causes of action alleged against Lawyers Title were for breach of contract, fraud, conspiracy to commit fraud, and negligent misrepresentation, for its role in the foregoing transactions. Flagstar alleged that the title company breached the title policies by failing to place the AFC/Flagstar mortgages in first position; defrauded Flagstar because the mortgages were not in first position; and conspired with AFC to defraud Flagstar.

Lawyers Title moved for summary judgment, contending that the title policies correctly reflected the liens against the properties, with Flagstar holding second liens

---

[1]     The additional defendants included the managing agents, loan officers and appraisers involved with the subject loans. This appeal solely concerns the claims against Lawyers Title in its capacity as sub-escrow agent and title insurer.

behind the original loans of the borrowers, negating the cause of action for breach of contract. Lawyers Title also asserted that it never communicated with Flagstar, and therefore could not, and did not, misrepresent anything to Flagstar, negating the cause of action for fraud; and that there was no evidence that Lawyers Title knew about, agreed to or benefited from AFC's fraud against Flagstar, negating the conspiracy allegation.

In opposition to the summary judgment motion, Flagstar admitted that the title policies listed its mortgages in second position; admitted that Lawyers Title never communicated with Flagstar, and failed to present any expert opinion or other evidence to supports its claim that the transactions were so "unusual" that a conspiracy to defraud could be inferred.

The trial court held a hearing on the summary judgment motion on September 1, 2013, at which Flagstar acknowledged that, had it reviewed the title policies, it would have discovered AFC's fraud: "I will concede that my client could have figured out they had been scammed sooner if they had read the policy."

The trial court granted the summary judgment motion, ruling that Lawyers Title had made a prima facie showing of the nonexistence of disputed material facts. Flagstar failed to carry its burden to show a disputed issue as to any claim.

Flagstar timely appealed the judgment. It identifies two issues on appeal: (1) whether its complaint included claims for breach of the escrow instructions and other closing instructions, and (2) whether summary judgment was properly granted on its fraud claims. We consider each contention in turn.

## DISCUSSION

"On appeal from a summary judgment, our task is to independently determine whether an issue of material fact exists and whether the moving party is entitled to summary judgment as a matter of law. [Citation.] 'We independently review the parties' papers supporting and opposing the motion, using the same method of analysis as the trial court. Essentially, we assume the role of the trial court and apply the same rules and

4

standards.' [Citation.] We apply the same three-step analysis required of the trial court. First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond. Second, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in the moving party's favor. When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable issue of material fact. [Citations.] In so doing, we liberally construe the opposing party's evidence, strictly construe the moving party's evidence, and resolve all doubts in favor of the opposing party. [Citations.]" (*Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 493-494.)

## 1. *Breach of contract claim*[2]

The complaint alleges that Lawyers Title "issued title commitments and/or final title policies on five (5) Subject Loans[3] where Flagstar's lien is not in first position" and that the title policies "were issued to facilitate and/or cover-up the fraudulent scheme alleged herein and that Lawyers Title knew that the Subject Loans at issue were going to be sold to Flagstar and that AFC's rights under the title commitments and/or final title policies would be assigned to Flagstar." Flagstar alleged that Lawyers Title and AFC entered into contracts "insuring that AFC's loans on the . . . Properties referenced above would be placed in first lien position. Flagstar was assigned AFC's rights under such contract when AFC sold these . . . Loans to Flagstar. [¶] [Lawyers Title] breached such contract because the AFC/Flagstar loans on the Subject Properties were never placed in first lien position."

---

[2]     The court has read and considered the parties' supplemental briefing, filed on March 17, 2014.

[3]     This appeal concerns three of those loans.

5

Flagstar concedes that the trial court correctly ruled that the title policies list the prior mortgages as exceptions to coverage. Consequently, contrary to the allegations of the complaint, Lawyers Title did not breach the title policies simply by virtue of the fact that AFC/Flagstar's mortgages were not first liens on the subject properties.

Flagstar argues, however, that the "real issue with respect to the title policies was not that Flagstar's liens were not in first position but that the liens were completely 'invalid.' By failing to pay off the existing liens, Lawyers' Title saddled the borrowers with two liens on their homes and failed to satisfy a condition precedent to the enforceability of Flagstar's liens." However, "a title policy does not cover losses that are sustained due to the lack of an existing indebtedness between the borrower and the lender. (See, e.g., *Pacific Am. Constr. v. Security Union Title* [(Utah 1999)] 987 P.2d [45,] 47 [lender's title insurance policy insuring against invalidity or unenforceability of insured mortgage lien does not cover loss due to lender's failure to disburse funds to owner of property securing the mortgage lien]; *Gerrold v. Penn Title Ins. Co.* (A.D.1994) 271 N.J. Super. 50, 637 A.2d 1293, 1295 [lender's title insurance policy insuring against invalidity or unenforceability of insured mortgage lien does not cover loss due to lender's failure to disburse funds to named borrower].)" (*First American Title Ins. Co. v. XWarehouse Lending Corp.* (2009) 177 Cal.App.4th 106, 118.) Contrary to Flagstar's argument, it did not suffer a loss in this transaction because the AFC/ Flagstar lien was not in first position; it suffered a loss because AFC stole the money intended to fund the loans. Title insurance simply does not insure against such a loss.

In response to the summary judgment motion, Flagstar also argued that Lawyers Title "breached its duties under the escrow and closing instructions and closing protection letters," which "unequivocally required that Lawyers Title pay off the existing mortgage liens on the property and that, instead, Lawyers Title diverted the payoff funds to AFC (who stole them)." The trial court noted that "[n]one of these documents are referenced in the complaint or plaintiff's discovery responses. The court concluded that, "[b]ecause plaintiff's factual submissions address facts immaterial to the allegations of the complaint

6

they do not create a triable issue of fact." Flagstar contends that the trial court erred by failing to liberally construe the allegations of the complaint with a view to substantial justice between the parties, as required by Code of Civil Procedure section 452.

Regardless of whether the complaint fairly apprised Lawyers Title of these additional breach of contract claims, Flagstar's evidence does not present a material issue of disputed fact requiring a trial. Flagstar was neither a party to the escrow contracts nor a third-party beneficiary of them. (Civ. Code, § 1559; *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1023.) It therefore has no standing to bring an action to enforce these contracts. (*Windham at Carmel Mountain Ranch Assn. v. Superior Court* (2003) 109 Cal.App.4th 1162, 1173.) To the extent that Flagstar seeks to enforce the contracts as AFC's successor-in-interest to, or assignee of, the subject loans, it is limited to the causes of action available to AFC. (See, e.g., *Searles Valley Minerals Operations Inc. v. Ralph M. Parsons Service Company* (2011) 191 Cal.App.4th 1394, 1402 [assignee of claim "stands in the shoes of the assignor, taking his rights and remedies, subject to *any defenses* which the *obligor* has against the assignor"]; *California Concrete Co. v. Beverly Hills Savings & Loan Assn.* (1989) 215 Cal.App.3d 260, 272 [successor-in-interest not entitled to assert any defenses to claim which could not be asserted by predecessor-in-interest].) Because it is undisputed that Lawyers Title followed AFC's instructions to disburse the funds to AFC rather than to pay off the prior mortgages (and in fact, AFC was not harmed by Lawyers Title's handling of the sub-escrows and issuance of the title policies), Flagstar can establish no actionable breach of the escrow and closing contracts.

2. *Fraud claims*

In its cause of action for fraud and conspiracy to commit fraud, Flagstar alleges that Lawyers Title "made, conspired to make, and/or ratified a series of misrepresentations to Plaintiff . . . about . . . the reconveyance of the prior first position liens . . . [¶] . . . with the knowledge that the representations were false at the time they

7

were made and with the intent of deceiving and inducing [Flagstar] to enter into the Subject Loan Transactions. . . ." Flagstar also stated a cause of action for negligent misrepresentation, alleging that the representations referred to above were made without "sufficient facts or other information on which to make and/or ratify said representations, and . . . without due care and without regard for the consequences thereof to [Flagstar], and/or without any reasonable basis or sufficient justification for [Lawyers Title] to believe them to be true."

"The elements of fraud, which give rise to the tort action for deceit, are (1) a misrepresentation, (2) with knowledge of its falsity, (3) with the intent to induce another's reliance on the misrepresentation, (4) justifiable reliance, and (5) resulting damage." (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1255.) When a fraud claim is based on concealment, rather than a direct misrepresentation of fact, the plaintiff must prove the following: "'"(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." [Citations.]' [Citation.] 'A duty to speak may arise in four ways: it may be directly imposed by statute or other prescriptive law; it may be voluntarily assumed by contractual undertaking; it may arise as an incident of a relationship between the defendant and the plaintiff; and it may arise as a result of other conduct by the defendant that makes it wrongful for him to remain silent.' [Citation.]" (*SCC Acquisitions, Inc. v. Central Pacific Bank* (2012) 207 Cal.App.4th 859, 864.)

Flagstar does not dispute the trial court's ruling that Lawyers Title did not make any statements to Flagstar, and thus made no misrepresentations, either intentional or negligent. Flagstar contends instead that Lawyers Title can be held liable "for failing to disclose to InSouth that its funds were not being used to pay off the existing liens and that

8

Flagstar had the right to assert this claim as InSouth's successor in interest based, in part, on the 'bailee' letters." However, rather than develop this assertion into an argument, Flagstar simply cites several cases which hold that an escrow holder may be held liable to its principal for failure to strictly comply with the escrow instructions (*Summit Fin. Holdings, Ltd. v. Continental Lawyers Title Co.* (2002) 27 Cal.4th 705, 711) and for intentional non-disclosure of a material fact which it is obligated to disclose. (*Moe v. Transamerica Title Ins. Co.* (1971) 21 Cal.App.3d 289, 306.) Neither Flagstar nor InSouth was Lawyers Title's principal. InSouth had no contract with Lawyers Title, and Flagstar was a stranger to the transaction, which purchased the loans some weeks subsequent to the closing. An escrow holder has no duty to a third-party which did not provide escrow instructions, even if the third-party is affected by the actions of the escrow. (*Markowitz v. Fidelity National Title Company* (2006) 142 Cal.App.4th 508, 527.) Thus, the trial court properly found there were no disputed material facts regarding Flagstar's fraud claim and that Lawyers Title was entitled to judgment as a matter of law.

Flagstar also seeks to hold Lawyers Title liable for AFC's fraud based on an aiding and abetting theory. Our colleagues on the Fourth District Court of Appeal recently considered the proper standard for imposing liability for aiding and abetting a tort. In *Casey v. U.S. Bank National Assn.* (2005) 127 Cal.App.4th 1138, the court acknowledged that "California has adopted the common law rule" that "'[l]iability may . . . be imposed on one who aids and abets the commission of an intentional tort if the person . . . knows the other's conduct constitutes a breach of a duty and gives substantial assistance or encouragement to the other to so act." (*Id.* at p. 1144, quoting *Fiol v. Doellstedt* (1996) 50 Cal.App.4th 1318, 1325; *see also Lomita Land & Water Co. v. Robinson* (1908) 154 Cal. 36, 97 P. 10, 15 ["'The words "aid and abet" as thus used have a well-understood meaning, and may fairly be construed to imply an intentional participation with *knowledge* of the object to be attained.'"]) The *Casey* court specified that in order to satisfy the knowledge prong, the plaintiff must prove that the

9

defendant had "actual knowledge of the specific primary wrong the defendant substantially assisted." (127 Cal.App.4th at p. 1145.)

Flagstar acknowledges that, in order to prevail on summary judgment, it must present evidence that Lawyers Title had actual knowledge of AFC's fraud. It contends that it presented such evidence, since the latter "may be inferred by the circumstances, including the fact that the transactions at issue were 'atypical' and lacked a legitimate business justification. (*See Neilson v. Union Bank of Cal., N.A.* (C.D.Cal. 2003) 290 F.Supp.2d 1101, 1120-1122.)" That evidence consisted of the deposition testimony of Michael Merlo, a Lawyers Title employee with 25 years experience in the title insurance business. Mr. Merlo responded in the negative to the question, "Have you personally ever been involved in a transaction where somebody asked for something to be recorded as a first priority lien and also instructed not to pay off the existing first priority lien?" In response to the question "So is it safe to say this is pretty unusual, Mr. Merlo responded, "In my experience, I would say yes." However, neither Mr. Merlo nor any other witness testified to a lack of business purpose for the transaction. Here, AFC told Lawyers Title that the purpose of delaying payoff of the existing mortgages was to allow time to renegotiate the prepayment penalties. An escrow agent has no duty to police escrow transactions, but rather to faithfully comply with the escrow instructions. (*Claussen v. First American Title Guaranty Co.* (1986) 186 Cal.App.3d 429, 436.) And it bears repeating that AFC, to whom Lawyers Title disbursed the InSouth funds, was the escrow agent for the refinance transaction, and thus a party which routinely receives and holds third-party funds for subsequent disbursement on behalf of its principals. Flagstar's evidence that AFC's instructions to Lawyers Title were atypical is not sufficient to permit the inference that the title company had actual knowledge of AFC's intent to defraud Flagstar.

10

3. *Trial court's finding of no justifiable reliance*

Flagstar argues that the trial court erred in concluding that Flagstar could not establish that it justifiably relied on AFC's fraudulent misrepresentations simply because it could have discovered the fraud had it obtained and reviewed the title policies within the 45-day period contemplated by the InSouth bailee letters. However, as we discuss above, the fraud claims fail not based on a lack of justifiable reliance, but based on the absence of a disputed issue of material fact concerning Lawyers Title's knowledge of AFC's fraudulent activity. Consequently, the issue of justifiable reliance is moot.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MINK, J. [*]

We concur:

TURNER, P. J.

KRIEGLER, J.

---

[*] Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11