BIG 5 SPORTING GOODS CORPORATION, a Delaware corporation, Plaintiff,

v.

ZURICH AMERICAN INSURANCE COMPANY, a New York corporation; and Hartford Fire Insurance Company, a Connecticut corporation, Defendants.

Case No. CV 012–03699 DMG (MANx).

United States District Court, C.D. California.

July 10, 2013.

David Allan Gauntlett, James A. Lowe, Gauntlett & Associates, Irvine, CA, for Plaintiff.

Eldon S. Edson, Jan L. Pocaterra, Selman Breitman LLP, David Simantob, Elizabeth L. Musser, Tressler LLP, Los Angeles, CA, for Defendants.

## ORDER RE PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT

DOLLY M. GEE, District Judge.

This matter is before the Court on the parties' cross-motions for summary judgment. For the reasons set forth below, Defendants' Motions for Summary Judgment are GRANTED and Plaintiff's Motion for Partial Summary Judgment is DENIED.

### I.

### *PROCEDURAL HISTORY*

On April 27, 2012, Plaintiff Big 5 Sporting Goods Corporation ("Big 5") filed a Complaint against Zurich American Insurance Company ("Zurich") and Hartford Fire Insurance Company ("Hartford"), collectively ("Defendants"), asserting claims under state law arising from Defendants' refusal to defend Plaintiff from third party lawsuits. Plaintiff alleges the following claims: (1) declaratory judgment on Defendants' duty to reimburse defense expenses; (2) breach of contract; and (3) breach of the duty of good faith and fair dealing. Defendants filed their respective Answers as well as Counterclaims on June 12, 2012. Plaintiff and Counter–Defendant filed an Answer to Zurich's Counterclaim on July 3, 2012. Plaintiff and Counter–Defendant filed an Answer to Hartford's Counterclaim on July 9, 2012.

On June 18, 2012, Plaintiff filed a Motion for Partial Summary Judgment ("Big 5 Mot.") as to Defendants' Duty to Reimburse Plaintiff's Defense Expenses. Zurich and Hartford each filed Oppositions to Plaintiff's Motion on July 6, 2012. Plaintiff filed a Reply on July 20, 2012.

On June 18, 2012, Hartford filed a Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Hartford Mot.") as to Plaintiff's claims for declaratory judgment, breach of contract, and breach of the duty of good faith and fair dealing. Plaintiff filed an Opposition on July 6, 2012. Hartford filed a Reply on July 20, 2012.

On July 5, 2012, Zurich filed a Corrected Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Zurich Mot.") as to Plaintiff's claims for declaratory judgment, breach of contract, and breach of the duty of good faith and fair dealing. Plaintiff filed an Opposition on July 6, 2012. Zurich filed a Reply on July 20, 2012.

The Court held a hearing on the motions on August 10, 2012 and, thereafter, took the matters under submission.

### II.

### *FACTUAL BACKGROUND*

### *Introduction*

Eleven underlying class action lawsuits allege that Big 5 infringed privacy rights by requesting, recording, and publishing customer zip codes during credit card transactions in violation of the Song–Beverly Act of 1991, Cal. Civ.Code

§ 1747.08(a)-(b). (Big 5's Mot. at 7; Big 5's Statement of Uncontroverted Facts ("BSUF"), *passim.*) The Song–Beverly Act prohibits a corporation that accepts credit cards for business transactions from requesting that the cardholder provide "personal identification information," which includes address and telephone number. Cal. Civ.Code § 1747.08(a)-(b).

### A. *The Song–Beverly Act*

Section 1747.08 of the Song–Beverly Act prohibits the requesting of "personal identification information" in connection with credit card transactions. Cal. Civ.Code § 1747.08(a)-(b). The Song–Beverly Act states:

(a) ... no person, firm, partnership, association, or corporation that accepts credit cards for the transaction of business shall do any of the following: * * *

(2) Request or require as a condition to accepting the credit card as payment in full or in part for goods or services, the cardholder to provide personal identification information, which the person, firm, partnership, association, or corporation accepting the credit card writes, causes to be written, or otherwise records upon the credit card transaction form or otherwise.

(b) For purposes of this section "personal identification information," means information concerning the cardholder, other than information set forth on the credit card, and including, but not limited to, the cardholder's address and telephone number....

Cal. Civ.Code § 1747.08(a)-(b).

Section 1747.08(e) states that, "[a]ny person who violates this section shall be subject to a civil penalty not to exceed two hundred fifty dollars ($250) for the first violation and one thousand dollars ($1,000) for each subsequent violation...." Section (e) further states, "[h]owever, no civil penalty shall be assessed for a violation of this section if the defendant shows by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error made notwithstanding the defendant's maintenance of procedures reasonably adopted to avoid that error." Cal. Civ.Code § 1747.08(e). Injunctive relief is available only in actions brought by the Attorney General, a district attorney, or a city attorney. Cal. Civ.Code § 1747.08(f).

In 2011, the California Supreme Court examined whether the Song–Beverly Act is violated when a business requests and records a customer's zip code during a credit card transaction. *Pineda v. Williams–Sonoma Stores, Inc.*, 51 Cal.4th 524, 527, 120 Cal.Rptr.3d 531, 246 P.3d 612 (2011). The court held that, "[i]n light of the statute's plain language, protective purpose, and legislative history, we conclude that a ZIP code constitutes 'personal identification information' as that phrase is used in section 1747.08." *Id.* The court further held that, "[t]hus, requesting and recording a cardholder's ZIP code, without more, violates the Credit Card Act." *Id.* at 527–528, 120 Cal.Rptr.3d 531, 246 P.3d 612.

### B. *The 2008 Underlying Actions*

In 2008, two class action lawsuits were filed against Big 5: *Zimmerman v. Big 5 Sporting Goods Corporation,* Case No. BC383834, Los Angeles County Superior Court ("*Zimmerman*"), and *Gonzalez v. Big 5 Sporting Goods Corporation,* Case No. 27–2008–00083307–CU–BT–CTL, San Diego County Superior Court ("*Gonzalez*") (the "2008 Underlying Actions"). (Big 5's Statement of Uncontroverted Facts ("BSUF") ¶¶ 22–24, 26–27.) Both alleged that Big 5 infringed customers' privacy rights by requesting, recording, and publishing customer zip codes in connection with credit card transactions, and

in violation of the Song–Beverly Act of 1991, Cal. Civ.Code § 1747.08(a)-(b). (BSUF ¶¶ 22, 24, 27.)

The *Zimmerman* complaint alleged a violation of the Song–Beverly Act and an additional California statutory violation. (Zurich's Statement of Uncontroverted Facts ("ZSUF") ¶ 27.) Specifically, the *Zimmerman* complaint alleged the following causes of action: (1) violation of the Song–Beverly Act; and (2) violations of California Civil Code Section 1750 *et seq.* (the "Consumers' Legal Remedy Act"). (ZSUF ¶ 27.) The *Zimmerman* action sought the following: (1) certification of a class; (2) civil penalties provided under the Song–Beverly Act; (3) injunctive relief; and (4) attorney's fees, costs and interests. (ZSUF ¶ 28.)

The *Gonzalez* complaint alleged two claims in addition to a violation of the SongBeverly Act. The *Gonzalez* complaint alleged: (1) violations of the Song–Beverly Act; (2) violation of California Business and Professions Code § 17200 *et seq.*; and (3) invasion of privacy. (ZSUF ¶¶ 30–31.) The *Gonzalez* action sought the following: (1) certification of a class; (2) civil penalties provided under the Song–Beverly Act; (3) injunctive relief; (4) general damages; (5) disgorgement of profits (and *cy pres* recovery); and (6) attorney's fees, costs and interests. (Joint Appendix, Exhibit 6 [*Gonzalez* complaint].)

## C. *The 2011 Underlying Actions* [1]

In 2011, nine more class action lawsuits were filed against Big 5 (the "2011 Underlying Actions").[2] (BSUF ¶¶ 29, 40.) The additional nine pending lawsuits allege that Big 5 violated class members' privacy rights by following its corporate policy requiring employees to request and record customers' zip codes in order to complete a credit card transaction. (BSUF ¶¶ 29, 40.)

Six of the 2011 Underlying Actions (the "Statute–Only Actions") allege that Big 5 violated the Song–Beverly Act. The Statute–Only Actions include the following lawsuits: *Matatova, Mossler, Holmes, Wiener, Smith,* and *Gabriel.* (Hartford's Statement of Uncontroverted Facts ("HSUF") ¶¶ 2–3, 7–8, 12–13, 17–18, 22–23, 27–28.) All of the Statute–Only Actions seek civil penalties for violation of the Song–Beverly Act pursuant to California Civil Code section 1747.08(e). (HSUF ¶¶ 4, 9, 14, 19, 24, 29.)

Two of the Underlying Actions, the *Nelson* and *Motta* actions, allege common law claims as well as violations of the Song–Beverly Act. (HSUF ¶¶ 37–38, 42–43.) The *Nelson* and *Motta* actions allege the following causes of action: (1) violation of the Song–Beverly Act; (2) common law negligence; (3) invasion of privacy; and (4) unlawful intrusion. (HSUF ¶¶ 37, 42.) The *Nelson* and *Motta* actions seek civil penalties pursuant to California Civil Code section 1747.08(e), general damages, disgorge-

---

**1.** The 2008 and 2011 Underlying Actions are referred to collectively as "the Underlying Actions."

**2.** *Nelson v. Big 5 Sporting Goods Corporation,* Case No. CGC–11–508829, San Francisco Superior Court; *Motta v. Big 5 Sporting Goods Corporation,* Case No. CGC–11–509228, San Francisco Superior Court; *Valiente v. Big 5 Sporting Goods Corporation,* Case No. BC455049, Los Angeles Superior Court; *Matatova v. Big 5 Sporting Goods Corporation et al,* Case No. BC455459, Los Angeles Superior

Court; *Mossler v. Big 5 Sporting Goods Corp.,* Case No. BC455477, Los Angeles Superior Court; *Holmes v. Big 5 Sporting Goods Corporation et al,* Case No. RG–11563123, Alameda Superior Court; *Wiener v. Big 5 Sporting Goods Corporation,* Case No. BC456300, Los Angeles Superior Court; *Smith v. Big 5 Sporting Goods Corporation,* Case No. 39–2011–00261014–CU–BT–STK, San Joaquin Superior Court; and *Gabriel v. Big 5 Sporting Goods Corporation,* Case No. BC462213, Los Angeles Superior Court.

ment of profits (and *cy pres* recovery), and injunctive relief. (HSUF ¶¶ 39–40, 44–45.)

One of the Underlying Actions, the *Valiente* action, alleges two claims in addition to the claim for violation of the Song–Beverly Act. (HSUF ¶ 31.) The *Valiente* action alleges the following causes of action: (1) violation of the Song–Beverly Act; (2) injunctive relief for violation of the Song–Beverly Act; and (3) violation of California Business and Professions Code § 17200 *et seq.* (HSUF ¶ 31.) The *Valiente* action seeks civil penalties pursuant to California Civil Code section 1747.08(e), injunctive relief, and restitution. (HSUF ¶¶ 33–34.)

All nine of the 2011 Underlying Actions were consolidated in October 2011 into the *Coordination Proceedings, Big 5 Sporting Goods Song–Beverly Cases*, Case No. JCCP 4667, Los Angeles Superior Court (the *"Coordinated Proceedings"*). (BSUF ¶¶ 60–61.) In the Coordinated Proceedings, Plaintiffs filed an Amended Consolidated Complaint which alleges that Big 5 violated the privacy rights of class members by obtaining, recording, and publishing customers' personal identification information including zip codes obtained as a condition to completing credit card purchases in Big 5 stores. (BSUF ¶ 61.) The Amended Consolidated Complaint contains claims for negligence, invasion of privacy, and unlawful intrusion in addition to allegations of Song–Beverly Act violations (ZSUF ¶ 38.) The Amended Consolidated Complaint alleges the following claims: (1) violation of the Song–Beverly Act; (2) common law negligence; (3) invasion of privacy; and (4) unlawful intrusion. (HSUF ¶ 47.) The Coordinated Proceedings plaintiffs seek civil penalties pursuant to California Civil Code section 1747.08(e), general damages, disgorgement of profits (and *cy pres* recovery), and injunctive relief. (HSUF ¶¶ 50–51.)

### D. *The Zurich Policies*

Zurich issued three Commercial General Liability ("CGL") insurance policies (the "Zurich Policies") to Big 5. (BSUF ¶ 4.) The first, policy number GLO 9262202–00, was effective September 25, 2007 through September 25, 2008. (Zurich's Statement of Uncontroverted Facts ("ZSUF") ¶ 1.) The second, policy number GLO 9262202–01, was effective September 25, 2008 through September 25, 2009. (ZSUF ¶ 2.) The third, policy number GLO 9262202–02, was effective September 25, 2009 through September 25, 2010. (ZSUF ¶ 3.)

Pursuant to the terms and conditions stated within Coverage A of the CGL Coverage Form, the Zurich Policies provide coverage for "bodily injury" or "property damage" during the policy period caused by an "occurrence". (ZSUF ¶ 4.) Coverage B of the Zurich CGL Coverage Form provides an "Insuring Agreement for 'personal and advertising injury' liability" which includes "[o]ral or written publication, in any manner, of material that violates a person's right of privacy." (ZSUF ¶¶ 16–17.) All three of the Zurich Policies contain Statutory Violation Exclusions which "barred coverage for 'bodily injury' and 'property damage' arising directly or indirectly out of Big 5's violation of statutes, particularly statutes which prohibit or limit the distribution, transmission, communication, or sending of information." (ZSUF ¶ 18.) The Zurich Policies also contain an endorsement with a Statutory Violation Exclusion which "barred coverage for 'personal and advertising injury' arising directly or indirectly out of Big 5's violation of statutes, particularly statutes which prohibit or limit the distribution, transmission, communication, or sending of information." (ZSUF ¶ 20.)

On February 8, 2008, Big 5 notified Zurich of the *Zimmerman* action and requested payment of defense expenses.

(BSUF ¶ 68.) On March 13, 2008, Zurich agreed to participate in funding Big 5's defense of the *Zimmerman* action pursuant to a reservation of rights. (BSUF ¶ 69.) In May 2009, Big 5 and the plaintiff class reached a settlement in the *Zimmerman* action by Big 5's payment of $30,000. (BSUF ¶ 70.)

On June 28, 2008, Big 5 gave Zurich notice of the *Gonzalez* action and requested reimbursement of defense expenses. (BSUF ¶ 45.) On July 11, 2008, Zurich agreed to participate in the *Gonzalez* defense subject to a reservation of rights. (BSUF ¶ 77.) Big 5 successfully defended the *Gonzalez* action and the case was dismissed. (BSUF ¶ 78.)

On March 28, 2011, Big 5 notified Zurich of the *Nelson* and *Motta* actions and requested payment of defense expenses as to both lawsuits. (BSUF ¶ 82.) On June 2, 2011, Zurich accepted tender of the *Nelson* and *Motta* actions under a full reservation of rights. (BSUF ¶ 83, ZSUF ¶ 36.) Between March 28, 2011 and June 1, 2011, Big 5 notified Zurich and requested defense expense reimbursement in the following underlying actions: *Valiente, Matatova, Mossler, Holmes, Wiener, Smith,* and *Gabriel,* before they were consolidated in the *Coordinated Proceedings.* (BSUF ¶ 86.) Zurich sent denial letters on May 27, 2011 as to the following lawsuits: *Valiente, Matatova, Wiener, Mossler, Smith,* and *Holmes.* (BSUF ¶ 87, ZSUF ¶ 37.) Zurich sent a denial letter as to the *Gabriel* action on September 21, 2011. (ZSUF ¶ 37.) On October 28, 2011, Big 5 tendered the Consolidated Complaint in the *Coordinated Proceedings* to Zurich. (ZSUF ¶ 39.) On December 19, 2011, Zurich agreed to participate in this defense subject to a full reservation of rights. (ZSUF ¶ 39.)

On the *Zimmerman* matter, under a full reservation of rights, Zurich made a defense costs payment to Big 5 of $27,675.03

as well as a settlement payment of $30,000. (ZSUF ¶ 43.) Zurich has made payments to Big 5, under the same full reservations of rights, for defense costs from some of the 2011 Song–Beverly Actions and the *Coordinated Proceedings* totaling $86,010.59. (ZSUF ¶¶ 44–46.)

### E. *The Hartford Policies*

Hartford issued one insurance policy to Big 5, policy number 72 ECS R95004, which was effective September 25, 2010 to September 25, 2011 (the "Hartford Policy"). (Hartford's Statement of Uncontroverted Facts ("HSUF") ¶ 55.) The Hartford Policy provides Big 5 with general liability coverage relating to lawsuits seeking "damages because of 'personal and advertising injury,'" which include offenses such as "[o]ral, written or electronic publication of material that violates a person's right of privacy," after the $250,000 Self–Insured Retention ("SIR") amount has been exhausted. (HSUF ¶¶ 58, 62, 67.) The Hartford Policy contains exclusions for "Knowing Violation Of Rights Of Another," "Right of Privacy Created By Statute," and "Distribution Of Material in Violation Of Statutes." (HSUF ¶¶ 71–73.)

The 2008 Underlying Actions were both filed and dismissed prior to the Hartford Policy effective dates. (BSUF ¶¶ 23, 26, 70, 78.) Thus, Big 5 is not seeking coverage from Hartford regarding those complaints. (Hearing Tr. 5:4–12, August 10, 2012.)

The 2011 Underlying Actions were tendered by Big 5 to Hartford for defense between March and October of 2011. (BSUF ¶¶ 82, 86, 91; HSUF ¶ 52.) Hartford denied coverage for the following actions: (1) *Matatova,* (2) *Mossler,* (3) *Holmes,* (4) *Wiener,* (5) *Smith,* (6) *Gabriel,* and (7) *Valiente.* (BSUF ¶¶ 89–90, HSUF ¶ 54.) Hartford agreed to defend Big 5 for the following actions: (1) *Nelson,* (2) *Motta,* and (3) the *Coordinated Proceedings,*

subject to a complete reservation of rights. (BSUF ¶¶ 86, 93, HSUF ¶ 53.)

## III.

### *LEGAL STANDARD*

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c)(2); *accord Mattos v. Agarano,* 590 F.3d 1082, 1085 (9th Cir. 2010). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548; *see also Bias v. Moynihan,* 508 F.3d 1212, 1218 (9th Cir.2007). "[T]he inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, "an opposing party may not rely merely on allegations or denials in its own pleading." Fed.R.Civ.P. 56(e).

A court presented with cross-motions for summary judgment should review each motion separately, giving the nonmoving party for each motion the benefit of all reasonable inferences from the record. *Center for Bio–Ethical Reform, Inc. v. Los Angeles County Sheriff Dep't,* 533 F.3d 780, 786 (9th Cir.2008), *cert. denied,* 555 U.S. 1098, 129 S.Ct. 903, 173 L.Ed.2d 108 (2009).

Determining the scope of coverage under an insurance contract, which generally involves only issues of law, is particularly appropriate for summary judgment. *See First Am. Title Ins. Co. v. XWarehouse Lending Corp.,* 177 Cal.App.4th 106, 113, 98 Cal.Rptr.3d 801 (2009) ("Summary judgment is an appropriate vehicle to determine coverage under an insurance policy when it appears there is no material issue of fact to be tried and the sole issue before the court is one of law." (internal quotation marks omitted)).

## IV.

### *DISCUSSION*

Big 5 moves for partial summary judgment alleging that, under the terms of the Zurich Policies and the Hartford Policy, collectively ("the Policies"), both Zurich and Hartford "are obligated to fully pay Big 5 for reasonable defense expenses" incurred as a result of the Underlying Actions but they "have failed and refused" to do so. (Big 5 Mot. at 1, 2.) As a result, Big 5 seeks a declaratory judgment that Zurich and Hartford are obligated to fully reimburse Big 5's defense expenses incurred in the Underlying Actions and a finding that, by failing to do so, the insurers have breached the terms of their contracts as well as the duty of good faith and fair dealing.

Defendants move for summary judgment or, in the alternative, partial summary judgment. Zurich requests that the Court find that they have not breached the terms of their insurance contracts nor acted in bad faith. (Zurich Mot. at 1.) In

addition, Hartford seeks a declaration that they have no duty to defend or indemnify Big 5 in any of the Underlying Actions at issue. (Hartford Mot. at 1.) Finally, Zurich seeks a declaratory order that Big 5 is to fully reimburse Zurich for all monies expended on behalf of Big 5 pertaining to the Song–Beverly Actions. (Zurich Mot. at 25.)

### A. Standards Governing The Duty To Defend

■ California law provides that, "an insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement." *See Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 19, 44 Cal. Rptr.2d 370, 900 P.2d 619 (1995) citing *Gray v. Zurich Insurance Co.*, 65 Cal.2d 263, 276, 54 Cal.Rptr. 104, 419 P.2d 168 (1966). Thus, an insurer's duty to defend arises from the facts, as opposed to causes of action, which may be gleaned from the complaint, the insured, or other sources. The insurer "bears a duty to defend its insured whenever it ascertains facts which give rise to the potential of liability under the policy." *Paramount Props. Co. v. Transamerica Title Ins. Co.*, 1 Cal.3d 562, 571, 83 Cal.Rptr. 394, 463 P.2d 746 (1970) (quoting *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 276–77, 54 Cal.Rptr. 104, 419 P.2d 168 (1966)) (internal quotation marks omitted); *Total Call Int'l, Inc. v. Peerless Ins. Co.*, 181 Cal.App.4th 161, 167, 104 Cal.Rptr.3d 319 (2010). An insurer must defend its insured against claims that create a *potential* for indemnity under the policy. *Montrose Chemical Corp. v. Superior Court*, 6 Cal.4th 287, 295, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (1993); *Gray* at 275, 54 Cal. Rptr. 104, 419 P.2d 168. The duty to defend is broader than the duty to indemnify, and it may apply even in an action where no damages are ultimately awarded. *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal.4th 1076, 1081, 17 Cal.Rptr.2d 210, 846 P.2d 792 (1993).

■ As the court in *Waller* explains, "*Gray* and its progeny have made it clear that the determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy." *Waller*, 11 Cal.4th at 19, 44 Cal.Rptr.2d 370, 900 P.2d 619. It is well settled that, "the insurer need not defend if the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage." *Gray*, 65 Cal.2d at 276, 54 Cal. Rptr. 104, 419 P.2d 168. Further, "where the extrinsic facts eliminate the potential for coverage, the insurer may decline to defend even when the bare allegations in the complaint suggest potential liability." *Waller* at 19, 44 Cal.Rptr.2d 370, 900 P.2d 619.

■ Notwithstanding the special features of insurance contracts, they are still subject to the ordinary rules of contractual interpretation. *Foster–Gardner, Inc. v. Nat'l Union Fire Ins. Co.*, 18 Cal.4th 857, 868, 77 Cal.Rptr.2d 107, 959 P.2d 265 (1998). Courts do interpret coverage clauses broadly, *Safeco Ins. Co. of Am. v. Andrews*, 915 F.2d 500, 502 (9th Cir.1990), and "provisions relating to exclusions or exceptions from the performance of the basic, underlying obligation are construed strictly against the insurer and liberally in favor of the insured." *Paramount Props. Co.*, 1 Cal.3d at 569, 83 Cal.Rptr. 394, 463 P.2d 746. When a policy's terms are plain and explicit, however, "courts will not indulge in a forced construction so as to fasten a liability on the insurance company which it has not assumed." *XWarehouse*, 177 Cal.App.4th at 115, 98 Cal.Rptr.3d 801. Only if an asserted ambiguity is not eliminated by the language and context of the policy will courts invoke the principle that

"ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage." *Id.*

Big 5 argues that, "[n]o matter how minimal, spare, or recondite complaint allegations may be, if they raise the merest glimmer of possible coverage, then the duty to reimburse defense expenses is triggered." (Big 5 Mot. at 5 citing *Hyundai Motor Am. v. National Union Fire Ins. Co. of Pittsburgh, PA,* 600 F.3d 1092, 1097 (9th Cir.2010)).

Hartford's response is that the Underlying Actions assert no claims that are even potentially covered by the Hartford Policies, and therefore they have no duty to defend.[3] (Hartford Mot. at 9.) Hartford further argues that without coverage, there is no viable breach of contract claim or claim for bad faith by the insured against the insurer. (*Id.* at 9–10.)

**B.  SIR Satisfaction Is A Condition Precedent To Any Duty to Defend**

■ Defendants first argue that Big 5 has not demonstrated satisfaction of the Self–Insured Retention ("SIR") which is a condition precedent to any defense coverage obligations. (Zurich Opp'n to Big 5 Mot. at 16; Hartford Opp'n to Big 5 Mot. at 22.) Zurich's SIR Endorsement requires payment of the SIR by specifying in Section I. H.: "Compliance with the requirements set forth in this endorsement is a condition precedent to coverage." (Declaration of Jan L. Pocaterra ("Pocaterra Dec."), Exh. B at 3.) Similarly, Hartford's agreement to defend was contingent on satisfaction of the Hartford Policy's $250,000 SIR. (HSUF ¶¶ 57, 58, 69.) Hartford's Policy language defines "Self–Insured Retention" as "the amount you must pay as damages and 'claim expenses' for 'personal and advertising injury', or

any one 'occurrence', respectively, before we will pay anything." (*Id.* at 69.)

*Legacy Vulcan Corp. v. Superior Court,* involved an insurer which brought an action against an insured seeking declaratory relief as to its duty to defend the insured in underlying litigation. 185 Cal.App.4th 677, 110 Cal.Rptr.3d 795 (2010). The court in *Legacy Vulcan* found that the duty to defend does not arise until the self-insured retention has been exhausted. *Id.* at 695, 110 Cal.Rptr.3d 795. The Legacy Vulcan court explains, "[i]n our view, a true 'self-insured retention,' expressly limits the duty to indemnify to liability in excess of a specified amount *and* expressly precludes any duty to defend until the insured has actually paid the specified amount." *Id.* at 694 n. 12, 110 Cal.Rptr.3d 795 (emphasis in original).

Thus, the Court agrees that SIR satisfaction is a condition precedent to any coverage obligations. As explained below, however, Big 5 has satisfied this condition.

**1.  The Zurich Policies SIR**

Each of the Zurich Policies contained an "SIR Endorsement" which set the SIR at $250,000 per "occurrence" which, Zurich argues, was required to be satisfied by Big 5 before any payment and/or reimbursement of defense costs or damages was made by Zurich. (ZSUF ¶ 6, 7; Pocaterra Dec., Exh. B.) Zurich's SIR Endorsement states:

"[Y]ou shall be responsible for payment of all damages and 'defense costs' as they are incurred for each 'occurrence' until you have paid damages and 'defense costs' equal to the Per Occurrence Amount shown in the Schedule.  . . . " (Pocaterra Dec., Exh. B at 1.) Directly above this provision is the term "SCHEDULE" which states that the Self–Insured Retention Amount is to be $250,000 Per Occurrence. (*Id.*)

**3.**  Hartford's arguments apply equally to Zurich.

Zurich defines "occurrence" according to their modified SIR Endorsement which states:

> "Occurrence" for purposes of this endorsement only, means an "occurrence", offense, accident, act, error or omission, or any other such similar event, as defined or used in our policy, that must occur in order to initiate payment of covered losses under the policy terms and conditions.[4]

(ZSUF ¶ 11; Pocaterra Dec., Exh. B.)

### 2. *The Hartford Policy SIR*

Hartford similarly argues that it had no obligation to pay defense costs until Big 5 paid a $250,000 SIR for covered offenses committed during the effective dates of the Hartford Policy. (Hartford Opp'n. to Big 5 Mot. at 22 citing Hartford's Additional Uncontroverted Facts ("HAUF") ¶ 75.) The Hartford Policy contains an SIR which states:

> 25. "Self-insured retention" refers to the amount(s) set forth in the Declarations as such [$250,000]: * * *
>
> d. ... [A]s respects the Personal and Advertising Injury Retention, or the

Each Occurrence Retention, "self-insured retention" means the amount you must pay as damages and *"claim expenses"* for "personal and advertising injury", or any one "occurrence", respectively, before we will pay anything.

You are responsible for payment of any sums in satisfaction of the "self-insured retention...."

(HSUF ¶ 69, emphasis added.)

### 3. *Terminology Defined*

Defendants argue that the only policy provisions that could potentially provide coverage are the "personal and advertising injury" provisions relating to invasion of privacy offenses. (Hartford Opp'n to Big 5 Mot. at 23; Zurich Opp'n to Big 5 Mot. at 18.) For both Zurich and Hartford, these provisions exist under "Coverage B" of the Policies.[5] (*Id.*) Defendants argue that the "occurrence" terminology used by Big 5 to discuss the triggering of SIR payment applies only to damages that arise out of the "property damage" and "bodily injury" provisions of the Policies which are strictly related to "Coverage A" under the Policies, which is not applicable in this case.[6] (*Id.*) Zurich further argues

---

4. Before the SIR Endorsement to the Zurich policies modified the definition of the term occurrence, "[t]he original definition of 'occurrence' in the Zurich policies was set out as follows: 'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (ZSUF ¶ 14.)

5. Coverage B of the Zurich Policies states: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." (ZSUF ¶ 16.)

Coverage B of the Hartford Policy states: We will pay those sums that you or any insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies; but only to the extent that such 'personal and advertising injury' is in excess of the 'self-

insured retention' that has been exhausted solely by the payment of 'claim expenses' and that portion of judgments or settlements to which this insurance would have applied in the absence of the 'self-insured retention.'" (HSUF ¶ 62.)

6. Coverage A of the Zurich Policies states: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." (ZSUF ¶ 12.)

Coverage A of the Hartford Policy states: "We will pay those sums that you or any insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies; but only to the extent that such 'bodily injury' or 'property damage' is in excess of the 'self-insured' retention that has been exhausted

that in order to initiate payment of a covered loss, an "offense," as listed under Coverage B must take place, as opposed to an "occurrence," which falls under Coverage A. (Zurich Opp'n to Big 5 Mot. at 18.) Zurich contends that because Big 5 asserts that the alleged invasion of privacy falls under an "offense" listed under Coverage B, it must instead entail "a discrete act within *one* of the seven defined groups of conduct and happen during one of the Zurich policy periods." (Zurich Opp'n to Big 5 Mot. at 18 citing Pocaterra Dec., Exhs. C1; C2.) Similarly, Hartford argues that, "[t]o the extent that an 'offense' is alleged (which Hartford denies), .each publication of a person's private information could constitute a separate offense, conceivably giving rise to the need to satisfy multiple SIRs." [7] (Hartford Opp'n to Big 5 at 24.)

### 4. Big 5 Satisfied the Self–Insured Retention Requirement

Big 5 points out that the Policies require it to pay a $250,000 SIR fee for each "occurrence", and that each "occurrence" SIR has been exhausted. (Big 5 Mot. at 20–21.) Big 5 asserts that, "[a]ll of the separate suits and each class member's separate claim is based on Big 5's corporate policy of collecting zip codes from customers. That is the overarching 'OCCURRENCE'....'" (Big 5 Mot. at 20–21.) Big 5 reasons that the requests by individual cashiers for customers' zip codes does not constitute the "occurrence" for purposes of the Policies but, rather, "[t]he single 'occurrence' over the years and cases was the *corporate policy* that set in motion the repeated events illustrated in

multiple class allegations." (*Id.* at 21; emphasis added.) Big 5 further argues that the single "occurrence" SIR was satisfied when Big 5 paid more than $250,000 in defense expenses in the *Zimmerman* case, the first of the Underlying Actions. (BSUF ¶ 72; Declaration of Ian Landgreen ("Landgreen Dec.), ¶ 73.)

Big 5 cites to several cases in support of its contention that it satisfied the SIR due to the existence of an overarching corporate policy. In *Appalachian Ins. Co. v. Liberty Mutual Ins. Co.*, 676 F.2d 56 (3d Cir.1982), the court examined whether a series of acts constituted a single occurrence or multiple occurrences. The case involved whether a liability insurer was required to provide coverage for an insured's discriminatory conduct arising out of a corporate policy of employment discrimination which "originated before the effective date of coverage but had an impact on class members both before and after that date." *Id.* at 58. In making its determination, the *Appalachian* court considered the cause of the loss and stated that: "The general rule is that an occurrence is determined by the cause or causes of the resulting injury.... Using this analysis, the court asks if '[t]here was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage.'" *Id.* at 61 (citations omitted). Ultimately, the *Appalachian* court found that "there was but one occurrence for purposes of policy coverage ... [the insured's] discriminatory employment policies." *Id.; see also Chemstar, Inc. v. Liberty Mut. Ins. Co.*, 41 F.3d 429, 431 (9th

---

solely by your payment of 'claim expenses' and that portion of judgments or settlements to which this insurance would have applied in the absence of the 'self-insured retention.'" (HSUF ¶ 61.)

**7.** The Court notes that when specifically asked about this issue during the August 10,

2012 Hearing on the Motions for Summary Judgment, defense counsel for Zurich stated: "What we're really saying is as long as there is at least one offense that clearly occurred during each policy period, then an SIR is owed for each of those *one offenses per policy period.*" (Hearing Tr. 36:18–21, August 10, 2012; emphasis added.)

Cir.1994); *EOTT Energy Corp. v. Storebrand Internat. Ins. Co.*, 45 Cal.App.4th 565, 575–78, 52 Cal.Rptr.2d 894 (1996).

Zurich argues that based on the "offense" language of the Zurich Policies, which renders them so-called "occurrence policies," coverage cannot even potentially be triggered. Zurich cites to *American Cyanamid Co. v. American Home Assurance Co.*, 30 Cal.App.4th 969, 981, 35 Cal. Rptr.2d 920 (1994), for the proposition that: "[T]he general rule regarding the trigger of coverage of an occurrence policy was not applicable to policies that did not even use the term occurrence." *Id.*

According to Big 5, "even if an 'occurrence' within the insurers' definition means an 'offense,'" as opposed to an ongoing corporate policy, the SIR is still satisfied because "the publication of customers' ZIP Codes could have occurred singularly and discretely in each pertinent policy year under the *Coordinated Proceedings*." (Big 5 Reply at 3.) Big 5 relies on its

Supplemental Statement of Uncontroverted Facts ("BSSUF") which cites to the Supplemental Declaration of Ian R. Landgreen ("S.L.D."), Exhibit 49, to show that "cannon bursts of 'published material' potentially occurred each policy year, evidencing defense expenditures in excess of the $250,000 SIR for each policy year." [8] (BSUF ¶¶ 96, 99.) Accordingly, Big 5 paid, at a minimum, the $250,000 per policy period for each of the four policies at issue, sufficiently satisfying the SIR requirements.[9] (BSSUF ¶¶ 97–99; SLD ¶¶ 5–9.)

Thus, the Court need not decide whether the definition of "occurrence" is an ongoing corporate policy and construe the language of the Policies (i.e., Zurich's "offense" and Hartford's "claim expenses"), because sufficient evidence exists to support a finding that the SIRs were satisfied based on the payments made within the policy periods as to the discrete acts and plaintiffs involved—even assuming Defen-

---

8. Big 5 argues that it is entitled to submit the new information in the BSSUF with their Reply because it was not until the Defendants' Opposition papers, instead of in their respective Motions for Summary Judgment, that Defendants asserted a new theory related to the SIRs. (Big 5 Reply citing [Doc. Nos. 28; 38].) Big 5 asserts that Defendants did this while knowing that satisfaction of the SIRs would be an issue in the case as they both raised the issue previously as an affirmative defense. (Big 5 Reply citing [Doc. Nos. 9:38; 15:26].) Big 5 states that, "[w]hen the non-movant raises new matters in its opposition, as Zurich and Hartford did, the movant's reply may properly address those matters." (BSSUF at 1, n. 1 citing *Walsh v. Provident Mut. Life Ins. Co. of Philadelphia*, 1999 WL 511928, at *4 (C.D.Cal. Apr. 22, 1999) citing *Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 767 F.Supp. 1220, 1235 (S.D.N.Y.1991) ("Clearly, reply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party who took it upon himself to argue those previously unforeseen issues")).

9. The unreimbursed defense expenses in the *Zimmerman* and *Gonzalez* actions, brought in 2007 and concluded in 2008, total $606,363.57 which exceeds the Zurich Policies' $250,000 "per occurrence" SIR for the September 27, 2007 to September 25, 2008 Policy period by $356,363.57. (BSSUF ¶¶ 97–98; S.L.D. ¶¶ 5–6, Exh. 49, Chart 1.)

The total defense expenses for the ten 2011 through March 2012 actions, namely *Motta, Nelson, Valiente, Mossler, Matatova, Holmes, Wiener, Smith, Gabriel*, and the *Coordinated Proceedings*, was $1,082.363.37. (BSSUF ¶ 99; S.L.D. ¶¶ 7–10, Exh. 49, Chart 2.) Zurich has reimbursed Big 5 $86,419.44 and Hartford has reimbursed Big 5 $86,010.59, leaving a total of $909,933.34 in unreimbursed defense expenses. (*Id.*) This exceeds the Zurich Policies' $250,000 "per occurrence" SIR for both the September 25, 2008 to September 25, 2009 and September 25, 2009 to September 25, 2010 Policy periods, as well as the Hartford $250,000 "per claim" SIR for the September 25, 2010 to September 25, 2011 Policy period by $159,933.34. (*See id.*)

dants' construction of the Policies is correct. (*See* BSSUF, *passim* citing S.L.D., Exh. 49.) The Court finds that, because the SIRs have been satisfied, this condition precedent to any defense reimbursement has been met.

### C. *Plaintiff Bears The Initial Burden Of Proving Coverage Applies*

■ Before considering whether any policy exclusions apply, the Court must first determine whether affirmative coverage exists at all. *Rosen v. Nations Title Insurance Co.,* 56 Cal.App.4th 1489, 66 Cal.Rptr.2d 714 (1997) (quoting *Collin v. Am. Empire Ins. Co.,* 21 Cal.App.4th 787, 803, 26 Cal.Rptr.2d 391 (1994)). The *Rosen* court states that, "although exclusions are construed narrowly and must be proven by the insurer, *the burden is on the insured to bring the claim within the basic scope of coverage,* and (unlike exclusions) courts will not indulge in a forced construction of the policy's insuring clause to bring a claim within the policy's coverage." *Rosen,* 56 Cal.App.4th at 1497, 66 Cal. Rptr.2d 714 (emphasis added; internal quotation marks omitted) (quoting *Collin v. Am. Empire Ins. Co.,* 21 Cal.App.4th 787, 803, 26 Cal.Rptr.2d 391 (1994)). Accordingly, Big 5 bears the initial burden of proving that the Underlying Actions fall within the scope of the Policies' coverage. *See id.; see also Waller,* 11 Cal.4th at 16, 44 Cal.Rptr.2d 370, 900 P.2d 619.

Big 5 argues that, "[t]he Policies' identical coverage language for 'personal and advertising injury' claims requires reimbursement for potentially covered claims alleging 'oral or written publication, in any manner of material that violates a person's right of privacy.'" (Big 5 Mot. at 6 quoting BSUF ¶¶ 8, 15.) Big 5 asserts that this language of the Policies creates a four-part test for determining whether alleged conduct falls within the requirements for coverage. (*Id.* at 6.) Big 5 simply breaks down the policy language to create this

four-part test: "(1) [o]ral or written publication, in any manner, (2) of material (3) that violates a person's (4) right of privacy." (*Id.*) Big 5 contends that the allegations in the Underlying Actions that "Big 5 requested, recorded, and 'disseminated' or 'shared and/or sold' the underlying claimants' ZIP codes" is sufficient to meet the requirements of their four-part test. (Big 5 Opp'n to Zurich Mot. at 1 citing BSUF, *passim.*) Big 5 claims that not only does the alleged conduct meet all of the elements of this four-part test, the duty to defend has been established "simply by the *potential* that these tests can be met." (Big 5 Mot. at 6 citing *Montrose Chem. Corp. v. Superior Court,* 6 Cal.4th 287, 299, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (1993)).

The Court concludes that because Big 5 has shown the potential for meeting the requirements under the Policies, its initial burden of demonstrating coverage has been met.

### D. *Statutory Violation Exclusions*

■ Defendants argue that they do not have a duty to defend the Underlying Actions because Statutory Violation Exclusions eliminate any potential for coverage. (Zurich Mot. at 9; Hartford Mot. at 18.) Zurich asserts that because the Zurich Policies all contain Statutory Violations Exclusions completely barring coverage for Song–Beverly Act claims, no potential for indemnity exists, and therefore Zurich owes no duty to defend Big 5 for any of the Underlying Actions. (Zurich Mot. at 13.) Similarly, Hartford asserts that they have no duty to defend any of the Underlying Actions as a matter of law because the "Right of Privacy Created By Statute" exclusion bars any potential for coverage. (Hartford Mot. at 18; HSUF ¶ 72.)

#### 1. *Interpretation Of Policy Language And The Function Of Exclusions*

In *Rosen v. Nations Title Insurance Co.,* 56 Cal.App.4th 1489, 1497, 66 Cal.

Rptr.2d 714 (1997), the court discusses the function of exclusions within insurance policies: "Insurance policies are written in two parts: an insuring agreement which defines the type of risks being covered, and exclusions, which remove coverage for certain risks which are initially within the insuring clause." *Id.* Defendants argue that because California courts have not addressed exclusions similar to the Statutory Violations Exclusions at issue, the Court should rely on the plain language of the policies and enforce the statutory exclusions as written. (Zurich Mot. at 9; Hartford Mot. at 18–19.)

"While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.... The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.... If contractual language is clear and explicit, it governs." *Bank of the West v. Superior Court,* 2 Cal.4th 1254, 1264, 10 Cal. Rptr.2d 538, 833 P.2d 545 (1992), citing Cal. Civ.Code §§ 1636, 1638; *see also AIU Ins. Co. v. Superior Court,* 51 Cal.3d 807, 822, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990) ("The clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage, controls judicial interpretation" (citations and internal quotations omitted)). As such, because the language of the Statutory Violation Exclusions is clear and explicit, the Court begins its analysis with the plain language of the policy exclusions.

### a. *Zurich Exclusions*

The Zurich Policies contain Statutory Violations Exclusions which include language barring coverage for "personal and advertising injury" "arising directly or indirectly out of Big 5's violation of statutes, particularly statutes which prohibit or limit the distribution, transmission, communi-

cation, or sending of information." (ZSUF ¶¶ 18, 20.) The Zurich policies effective from September 2007 through September 2008 and September 2008 through September 2009 contain a Statutory Violation Exclusion which states:

B. The following exclusion is added to Paragraph 2., **Exclusions of Section 1—Coverage B—Personal And Advertising Injury Liability:**

2. Exclusions

This insurance does not apply to:

**DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES.**

"Personal and Advertising Injury" arising directly or indirectly out of any action or omission that violate or is alleged to violate: * * *

c. Any statute, ordinance or regulation, other than the TCPA or CAN–SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information. (ZSUF ¶ 21.)

The Zurich policy effective September 2009 through September 2010 contains a "Statutory Violation Exclusion" similar to, but slightly modified from, the earlier version which states:

B. Exclusion p. under Paragraph 2., **Exclusions of Section—Coverage B— Personal and Advertising Injury Liability** is replaced by the following:

2. **Exclusions**

This insurance does not apply to:

p. **Distribution of Material in Violation of Statutes**

"Personal and advertising injury" arising directly or indirectly out of action or omission that violates or is alleged to violate: * * *

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN–SPAM Act of 2003 or

FCRA, that relates to, prohibits or limits the accessing, collection, recording, printing, dissemination, disposal, sending, transmitting, communicating or distribution of material or information. (ZSUF ¶ 22.)

### b. *Hartford Exclusion*

The Hartford Policy contains a Statutory Violation Exclusion barring coverage for acts arising out of the violation of a person's "Right Of Privacy Created By Statute" which eliminates coverage for "personal or advertising injury" "arising out of the violation of a person's right of privacy created by any state or federal act." (HSUF ¶ 72.) The Hartford Policy, effective September 25, 2010 to September 25, 2011, provides the following Statutory Violation Exclusion:

2. **Exclusions**

This insurance does not apply to: * * *

**q. Right Of Privacy Created By Statute**

"Personal and advertising injury" arising out of the violation of a person's right of privacy created by any state or federal act.

However, this exclusion does not apply to liability for damages that the insured would have in the absence of such state or federal act.... (HSUF ¶¶ 55, 72.)

The Hartford Policy also provides the following Statutory Violation Exclusion:

2. **Exclusions**

This insurance does not apply to: * * *

**w. Distribution Of Material In Violation Of Statutes**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate: * * *

(3) Any Statute, ordinance or regulation, other than TCPA or CAN–SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.... (HSUF ¶ 73.)

### E. *Statutory Construction And Legislative History Of The Song–Beverly Act*

Big 5 contends that the enumerated Statutory Violations Exclusions do not bar the potential for coverage under the Policies because the underlying allegations, "were not based on any statute but are ingrained in California's Constitution." (Big 5 Mot. at 24 citing *Hill v. Nat'l Collegiate Athletic Ass'n.*, 7 Cal.4th 1, 15, 26 Cal.Rptr.2d 834, 865 P.2d 633 (1994)). The basis for the claims, according to Big 5, is California's right of privacy arising from Article I, Section I of the California Constitution. *Id.*

Hartford, and by extension Zurich, argues that because "[n]o California cases interpret a 'Right of Privacy Created By Statute' exclusion similar to that in the Hartford Policy ... it is appropriate for this Court to rely on the Hartford Policy's plain language." (Hartford Mot. at 18.) Hartford further argues that the plain language of the "Right of Privacy Created By Statute" exclusion in Hartford's Policy "eliminates coverage for an invasion of privacy enumerated offense, if the offense arises out of a privacy right *created by a statute* (as opposed to a right of privacy existing at common law)." (*Id.* at 19.)

The legislative history of the Song–Beverly Act is instructive on this issue. *Archer v. United Rentals, Inc.*, 195 Cal.App.4th 807, 817, 126 Cal.Rptr.3d 118 (2011) ("If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history"). The legislative history of the Song–Beverly Act illustrates that the Act created a new statutory right of privacy in 1991 that previously did not

exist at common law. (Hartford's Mot. at 19.) In 1991, the section of the Song–Beverly Act that pertains to "personal identification information" and credit card transactions was added and codified in California Civil Code Section 1747.08. The legislative history of the Song–Beverly Act as discussed in the Legislative Counsel's Digest to California Assembly Bill 2920 (1989–1990 Reg. Sess.), February 14, 1990 states:

> Existing law does not prohibit persons who accept credit cards in business transactions from requiring the cardholder to write or provide personal identification information for notation on the credit card transaction form.
>
> This bill would enact such a prohibition. . . .

A.B. No. 2920, Legislative Counsel's Digest (1989–1990 Reg. Sess.), February 14, 1990.

The Bill Analysis of AB 290 by the Principal Analyst and Program Budget Manager to the Office of the Governor, dated July 22, 1990, similarly indicates:

> Under current law, persons or businesses which accept credit cards in business transactions are not restricted from requiring personal identification information from credit card holders, such as

the cardholder's address and telephone number, as a condition of accepting the card for the transaction. AB 290 would prohibit persons or businesses from requiring such information.

Bill Analysis of AB 290, Governor's Office, July 22, 1990.

This legislative history shows that prior to the 1991 addition to the Song–Beverly Act, there was no common law invasion of privacy right that prevented businesses from requiring customers to provide "personal identification information," including their zip codes, in connection with credit card transactions. (Hartford Mot. at 20; *see also Pineda v. Williams–Sonoma Stores, Inc.*, 51 Cal.4th 524, 527, 120 Cal. Rptr.3d 531, 246 P.3d 612 (2011)). Because this specific and narrow privacy right was expressly created by statute, and therefore not based on common law, the Court finds that any claims alleged in the Underlying Actions are subject to the relevant statutory exclusions.[10]

*Folgelstrom v. Lamps Plus, Inc.*, 195 Cal.App.4th 986, 989, 125 Cal.Rptr.3d 260 (2011), is closely on point. In *Folgelstrom,* the plaintiff filed a lawsuit against Lamps Plus based on the allegations that Lamps Plus requested zip codes from customers during credit card transactions in order to

---

**10.** This conclusion is bolstered by a plethora of cases finding that a statutory claim under the Song–Beverly Act, as opposed to common law or state constitutional privacy claims, is the primary means of challenging the type of conduct alleged in the Underlying Actions. *See, e.g., Haug v. PetSmart, Inc.*, No. 10–cv–00990–MCE–KJM, 2010 WL 2925069, *2, 2010 U.S. Dist. LEXIS 84739, **3–4 (E.D.Cal. July 23, 2010) ("Prior to enactment of the Act, existing law neither authorized or prohibited merchants from requiring personal information as part of a credit card transaction. . . . Where a new right is created by statute, the party aggrieved by its violation is confined to the statutory remedy if one is provided.") (citations omitted); *Archer v. United Rentals, Inc.*, 195 Cal.App.4th 807, 816, 126 Cal. Rptr.3d 118 (2011) (Court dismissed plaintiffs' UCL claim for injunctive relief in case brought under the Song-Beverly Act involving store's request for customers' personal identification information when making credit card purchases); *Estate of Starkweather*, 64 Cal. App.4th 580, 593, 75 Cal.Rptr.2d 766 (1998) ("[W]here a new right is created by statute, the party aggrieved by its violation is confined to the statutory remedy if one is provided"); *Korn v. Polo Ralph Lauren Corporation*, 644 F.Supp.2d 1212, 1219 (E.D.Ca.2008), discussed *infra*, ("When enacted, the Song Beverly Act addressed the existing law that neither authorizes nor forbade merchants from requiring personal information as part of a credit card transaction. . . . As such, the statute created new rights").

obtain their home addresses to mail them marketing materials. Under these facts, the plaintiff alleged the following claims against Lamps Plus: (1) violation of the Credit Card Act, (2) invasion of his common law and constitutional rights to privacy, and (3) violation of Business and Professions Code section 17200, the Unfair Competition Law (UCL). *Id.* The court held that the trial court properly dismissed the common law and constitutional invasion of privacy as well as the UCL claims. *Id.* at 992–93, 125 Cal.Rptr.3d 260. The court reasoned that "[a]ctionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right." *Id.* at 992, 125 Cal.Rptr.3d 260 citing *Hill v. National Collegiate Athletic Assn.,* 7 Cal.4th 1, 37, 26 Cal.Rptr.2d 834, 865 P.2d 633 (1994). The court concluded that "the conduct of which plaintiff complains does not constitute a 'serious' invasion of privacy." *Id.* The *Folgelstrom* court determined that the relevant case law did "not support the conclusion that this court should recognize a privacy interest on the part of the plaintiff to not receive unsolicited mailings from a retail business."[11] *Id.* at 991, 125 Cal.Rptr.3d 260. Thus, despite the label attached to the claims alleged, the *Folgelstrom* court found that the facts determined there was no actionable violation under state or common law privacy rights. *Id.* Like the court in *Folgelstrom,* this Court similarly finds that the facts pleaded in the Underlying

---

11. Big 5 argues that they "not only 'recorded' claimants' ZIP codes but also 'shared [them] with others' and 'sold' them to others", and that this act of disseminating information facilitates the potential for "harassment, fraud and identity theft" claims, as discussed *infra.* (Big 5 Opp'n to Zurich's Mot. at 8–9 citing *Coordinated Proceedings* Amended Consolidated Complaint [Doc. No. 21–10, ¶ 78].) Further, Big 5 asserts that the "implications" from these "pled facts" are sufficient to form the basis for a present invasion of privacy claim and is "not speculation" about possible future invasions of privacy or the potential for such claims. (Big 5 Opp'n to Zurich's Mot. at 9.) The Court disagrees with Big 5's analysis.

In *Folgelstrom,* Lamps Plus used the zip codes provided by their customers to produce a mailing list comprised of their customers' addresses for the purpose of mailing them marketing materials. *Folgelstrom* at 989, 125 Cal.Rptr.3d 260. Similarly, Big 5 states that it "used the customer zip codes" to determine where to "open new Big 5 stores and distribute newspaper flyers." (Zurich's Request for Judicial Notice, Exh. 1, p. 4, "Defendant Big 5 Sporting Goods Corporation and Big 5 Corp.'s Briefing" [Doc. No. 51–2, Exh. 1]; pursuant to Rule 201 of the Federal Rules of Evidence, the Court takes judicial notice of this document.) The Court sees no difference between the facts of *Folgelstrom* and the facts of the instant case in this regard.

Big 5 further attempts to distinguish the facts of the Underlying Actions by asserting that, "Big 5's alleged dissemination of information and sharing it with third parties ... is a publication in any sense of the word", thus rendering the facts of the Underlying Actions outside the purview of the Song–Beverly Actions. (Big 5 Reply at 7 citing, e.g., HSUF ¶ 3; ZSUF ¶ 26; BSUF ¶ 24.) For example, Big 5 refers to the language of the *Zimmerman* complaint which alleged that Big 5 "used the personal information ... for business purposes, including to create and maintain a database for in-house or other forms of marketing and advertising and/or to sell data to direct marketing specialists or other third parties." (ZSUF ¶ 26.) In *Folgelstrom,* however, Lamps Plus similarly used the customers' personal information for marketing purposes and provided the information to a third party. *Folgelstrom* at 989, 125 Cal.Rptr.3d 260. In *Folgelstrom,* Lamps Plus provided "the customer's name, credit card number and ZIP code to Experian Marketing Services, a third party credit reporting agency. Experian matches the information provided by Lamps Plus with the customer's address stored in its own records to produce a mailing list" for use by Lamps Plus. *Id.* The Court is not persuaded that the facts in this case suggest a significant enough departure from the facts of *Folgelstrom* to warrant a different outcome.

Actions do not rise to the level of a potential invasion of privacy claim under common law.

### F. *Facts, Not Labels, Are Dispositive*

The parties appear to agree that the Court must look to the facts as alleged in a third party complaint, and not to any technical labels, in determining whether coverage applies to the insured.

Big 5 argues in its Opposition to Hartford's Motion for Summary Judgment ("Big 5 Opp'n to Hartford") that, "[e]ven if the Policy's exclusion for a 'right of privacy created by statute' might bar claims under the SBA [Song–Beverly Act], it cannot preclude coverage for non-statutory privacy rights." (Big 5 Opp'n to Hartford at 2.) Big 5 further maintains that, "[e]ven if some claims might be legally groundless ... their validity cannot be determined in this Court but must be decided in the underlying lawsuit." *Id.* Big 5 cites to *Scottsdale Ins. Co. v. MV Transp.*, for the following premise: "[T]hat the precise causes of action pled by the third-party complaint may fall outside policy coverage does not excuse the duty to defend where, under the facts alleged, reasonably inferable, or otherwise known, the complaint could fairly be amended to state a covered liability." (Big 5 Mot. at 9 citing *Scottsdale Ins. Co.*, 36 Cal.4th 643, 654, 31 Cal. Rptr.3d 147, 115 P.3d 460 (2005).)

Zurich asserts in its analysis of *Scottsdale* that, "Zurich's policies never afforded potential coverage for any of Big 5's claims because every cause of action in each underlying complaint was either directly or indirectly caused by alleged statutory violations of the Song Beverly Act." (Zurich Mot. at 17.) The *Scottsdale* court addresses this issue:

> If any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy,

the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage. On the other hand, if, as a matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise on the first instance. *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal.4th 643, 654, 31 Cal.Rptr.3d 147, 115 P.3d 460 (2005).

Big 5 also argues that, "the eventual factual determinations made in the underlying cases has no bearing on the insurer's initial duties." (Big 5's Statement of Genuine Disputes As To Zurich's Statement of Facts at 39 [Doc. No. 45].) Big 5 cites to *Los Osos Cmty. Servs. Dist. v. Am. Alt. Ins. Corp.*, 585 F.Supp.2d 1195, 1203 (C.D.Cal.2008), for the proposition that the duty to defend extends even to "groundless, frivolous, false and fraudulent claims asserted against the insured." *Id.* While it is true that the duty to defend is broader than the duty to indemnify, there still has to be some potential for liability—which the Court does not find in the facts pleaded in the Underlying Actions. As the court aptly states in *Gunderson v. Fire Insurance Exchange*, 37 Cal.App.4th 1106, 1114, 44 Cal.Rptr.2d 272 (1995):

> An insured may not trigger the duty to defend by speculating about extraneous 'facts' regarding potential liability or ways in which the third party claimant might amend its complaint at some future date. This approach misconstrues the principle of 'potential liability' under an insurance policy. Although an insurer's duty to defend is broader than the duty to indemnify, the duty to defend depends upon *facts* known to the insurer at the inception of the suit.

(emphasis in original; citations omitted.)

In its Opposition to Hartford's Motion, Big 5 claims that allegations in the Consol-

idated Amended Complaint in the *Coordinated Proceedings* give rise to "inferences" and "implications" that may be "reasonably interpreted" to grant coverage under an "invasion of privacy" theory. (Big 5 Opp'n to Hartford at 5.) Big 5 further attempts to bolster its argument by relying on the allegations in the Consolidated Amended Complaint in the *Coordinated Proceedings* which states:

> Defendants' actions constitute a "serious" invasion of privacy in that Plaintiffs and the class have had their private home addresses accessed, shared, and/or sold to others without their knowledge or consent. In addition to the unwanted dissemination of their private information, Plaintiffs and the Class have been placed at *serious risk* of harassment, fraud and identity theft as a result of Defendants' conduct.

(Big 5 Opp'n to Hartford at 5; *Coordinated Proceedings* Amended Consolidated Complaint [Doc. No. 21–10, ¶ 78] (emphasis added).)

This Court agrees with the following observations in *Folgelstrom,* discussed *supra,* which alleges facts involving misconduct identical to the instant case:

> As with the alleged constitutional violation, whether or not plaintiff has sufficiently alleged an intrusion into his private matters, the conduct of which he complains does not meet the standard of "highly offensive." Indeed, we have found no case which imposes liability based on the defendant obtaining unwanted access to the plaintiff's private information which did not also allege the *use* of plaintiff's information was highly offensive. However questionable the means employed to obtain plaintiff's address, there is no allegation that Lamps Plus used the address once obtained for an offensive or improper purpose.

*Folgelstrom,* 195 Cal.App.4th at 993, 125 Cal.Rptr.3d 260.

The plaintiff in *Folgelstrom,* much like Big 5, attempted to strengthen his case by raising the specter of a potential identity theft claim. Big 5 states in the Amended Consolidated Complaint in the *Coordinated Proceedings* that the plaintiffs and the class involved were "placed at serious risk of harassment, fraud and identity theft" due to the conduct by the defendants. (*Coordinated Proceedings* Amended Consolidated Complaint [Doc. No. 21–10, ¶ 78].) Yet, a risk alone, without more, does not constitute a sufficient basis for the Court to find the potential for coverage under the Policies. As the *Folgelstrom* court aptly explained, "we note that plaintiff seeks to add gravity to his privacy claims by suggesting that Lamps Plus's conduct increased the risk that he would be victimized in an identity theft scam. This is a speculative conclusion of fact which we may disregard...." 195 Cal. App.4th at 993, 125 Cal.Rptr.3d 260.

### 1. *Negligence and Invasion of Privacy Claims*

In addition to the causes of action related to the Song–Beverly Act, Big 5 asserts claims in the Underlying Actions for negligence and invasion of privacy. Defendants' argue, and the Court agrees, that because of the actual nature of the facts alleged, said claims do not trigger coverage under the Policies.

In *Swain v. Cal. Cas. Ins. Co.,* the plaintiff's complaint alleged a cause of action for "simple negligence." 99 Cal.App.4th, 1, 8, 120 Cal.Rptr.2d 808 (2002). The *Swain* court held that:

> [C]overage turns not on the technical legal cause of action pleaded by the third party but on the *facts* alleged in the underlying complaint or otherwise known to the insurer. A general boilerplate pleading of negligence adds nothing to a complaint otherwise devoid of *facts* giving rise to a potential for cov-

ered liability.... [T]he pleading of alternative legal theories of liability does not alter the nature of the conduct which forms the basis for the complaint.

*Id.* at 8–9, 120 Cal.Rptr.2d 808 (alteration in original; citations omitted).

Further, in *Fire Ins. Exch. v. Jiminez,* the court discouraged the practice of alleging superfluous negligence claims by stating that, "mere allegations of 'general negligence' would erase exclusions in any policy." 184 Cal.App.3d 437, 443 n. 2, 229 Cal.Rptr. 83 (1986).

██ Lastly, as the court in *CNA Casualty of Cal. v. Seaboard Surety Co.* observed, "[i]t makes no difference that for strategic adversarial reasons this cause of action was labelled [sic] 'antitrust'; ... it is not the form or title of a cause of action that determines the carrier's duty to defend, but the potential liability suggested by the facts alleged or otherwise available to the insurer." 176 Cal.App.3d 598, 609, 222 Cal.Rptr. 276 (1986).

### G. *Civil Penalties Cannot Be Recovered Under The Policies*

██ The Hartford Policy states: "We will pay those sums that you or any insured becomes legally obligated to pay as *damages* because of 'personal and advertising injury' to which this insurance applies." (HSUF ¶ 62) (emphasis added.) Similarly, the Zurich Policies state, pursuant to Coverage B: "We will pay those sums that the insured becomes legally obligated to pay as *damages* because of 'personal and advertising injury' to which this insurance applies." (ZSUF ¶ 16) (emphasis added.)

The Court agrees with Defendants that civil penalties, such as those available under the Song–Beverly Act, attorneys' fees, and disgorgement and restitutionary remedies for violation of California Business & Professions Code section 17200 are not 'damages' even potentially covered under the Policies. (*See* Hartford's Reply at 14.) As the California Supreme Court explained in *Bank of the West, supra,* 2 Cal.4th at 1266, 10 Cal.Rptr.2d 538, 833 P.2d 545:

> The Bank argues that the term 'damages' for insurance purposes includes virtually all forms of monetary relief.... However, the argument is too broad. It is well established that one may not insure against the risk of being ordered to return money or property that has been wrongfully acquired. Such orders do not award 'damages' as that term is used in insurance policies.

*See Jaffe v. Cranford Ins. Co.,* 168 Cal. App.3d 930, 934–935, 214 Cal.Rptr. 567 (1985); *see also Bullock v. Md. Casualty Co.,* 85 Cal.App.4th 1435, 1448, 102 Cal. Rptr.2d 804 (2001) (reasoning that civil penalties for violation of city ordinance did not trigger duty to defend because "public policy would not permit defendants to insure those sums").

The *Korn* case is also instructive. In *Korn,* the court examined the issue of whether the plaintiff, who brought suit against Polo Ralph Lauren alleging violations of the Song–Beverly Act, was entitled to injunctive relief or limited to suing for civil damages. *Korn v. Polo Ralph Lauren Corporation,* 644 F.Supp.2d 1212, 1218–19 (E.D.Ca.2008). In granting defendant's motion to strike plaintiff's claim for injunctive relief the court reasoned:

> When enacted, the Song Beverly Act addressed the existing law that neither authorizes nor forbade merchants from requiring personal information as part of a credit card transaction.... As such, the statute created new rights. A plain reading of the statute as a whole reveals, unambiguously, that plaintiffs may sue for civil penalties while the Attorney General or other government actor may sue for both civil penalties and injunc-

tive relief. Plaintiff, as a private citizen, is confined to the statutory remedy of civil penalties as expressly provided in § 1747.08(e).

*Korn,* 644 F.Supp.2d at 1219; *see also De Anza Santa Cruz Mobile Estates Home-owner's Assn. v. De Anza Santa Cruz Mobile Estates,* 94 Cal.App.4th 890, 912, 114 Cal.Rptr.2d 708 (2001) ("Where a statute creates new rights and obligations not previously existing in the common law, the express statutory remedy is deemed to be the exclusive remedy available for statutory violations....").

Pursuant to the analysis in *Korn,* Big 5 is confined to the statutory remedy of civil penalties under the Song–Beverly Act. Because the Statutory Violations Exclusions in the Policies expressly exclude coverage for violations of the Song–Beverly Act, as discussed *supra,* Big 5 is not entitled to relief.

### H. *The Song–Beverly Act Provides Relief Only For Intentional Conduct*

The Song–Beverly Act states: "[N]o civil penalty shall be assessed for a violation of this section if the defendant shows by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error made notwithstanding the defendant's maintenance of procedures reasonably adopted to avoid that error." Cal. Civ.Code § 1747.08(e). Thus, in order to be afforded coverage under the Song–Beverly Act, the defendant's conduct must be intentional in nature. *Id.*

### 1. *Public Policy, The Hartford Insurance Policy Exclusion, And California Insurance Code § 533 Proscribe Coverage For Intentional Conduct*

Pursuant to the Hartford Policy exclusion for the "Knowing Violation Of Rights of Another," coverage is excluded for intentional conduct, i.e., for " 'Personal and advertising injury' arising out of an offense committed by, at the direction or with the consent or acquiescence of the insured with the expectation of inflicting 'personal and advertising injury'." (HSUF ¶ 71.)

California Insurance Code Section 533 similarly functions as an "implied exclusionary clause which by statute is to be read into all insurance policies" proscribing coverage for loss due to "willful acts" by the insured. (*J.C. Penney Cas. Ins. Co. v. M.K.,* 52 Cal.3d 1009, 1019, 278 Cal. Rptr. 64, 804 P.2d 689 (1991) citing Cal. Ins.Code § 533.) Section 533 states: "An insurer is not liable for a loss caused by the willful act of the insured ..." Cal. Ins.Code § 533. "Section 533 reflects a fundamental public policy of denying coverage for willful wrongs. The parties to an insurance policy therefore cannot contract for such coverage. We therefore need not and do not decide whether coverage could be excluded by the explicit policy exclusion in the absence of section 533." 52 Cal.3d at 1020 n. 8, 278 Cal.Rptr. 64, 804 P.2d 689 (citations omitted). Thus, because all of Big 5's alleged conduct falls within the purview of the Song–Beverly Act which requires intentional conduct in order for relief, but which is not covered under the Policies, Big 5 is similarly not entitled to coverage under this theory.

In sum, because all of the Underlying Actions in this case arise out of the alleged violation of the statutory right to privacy, specifically the Song–Beverly Act, coverage is barred by the Statutory Violations Exclusions under the Policies. Defendants have established, as a matter of law, that there is no conceivable theory under which the claims in the Underlying Actions warrant coverage. Viewing the facts in the light most favorable to Plaintiff does not change this outcome. Accordingly, Defendants are entitled to summary judgment. Conversely, Plaintiff is not.

## V.

### *CONCLUSION*

In light of the foregoing:

1. Defendant Zurich's Motion for Summary Judgment is GRANTED;
2. Defendant Hartford's Motion for Summary Judgment is GRANTED; and
3. Plaintiff's Motion for Partial Summary Judgment is DENIED.

IT IS SO ORDERED.